# REID, SUPERINTENDENT, DISTRICT OF COLUMBIA JAIL, *v.* COVERT.

No. 701, October Term, 1955.  Argued May 3, 1956; decided June 11, 1956; rehearing granted November 5, 1956; reargued February 27, 1957.—Decided June 10, 1957.

1

2

*Solicitor General Rankin* reargued the cause for appellant in No. 701 and petitioner in No. 713. With him on the brief were *Assistant Attorney General Olney, Roger Fisher, Beatrice Rosenberg, Carl B. Klein* and *William M. Burch II.*

*Frederick Bernays Wiener* reargued the cause for appellee in No. 701 and respondent in No. 713. With him on the brief was *Adam Richmond.*

MR. JUSTICE BLACK announced the judgment of the Court and delivered an opinion, in which THE CHIEF JUSTICE, MR. JUSTICE DOUGLAS, and MR. JUSTICE BRENNAN join.

These cases raise basic constitutional issues of the utmost concern. They call into question the role of the military under our system of government. They involve the power of Congress to expose civilians to trial by military tribunals, under military regulations and procedures, for offenses against the United States thereby depriving them of trial in civilian courts, under civilian laws and procedures and with all the safeguards of the Bill of Rights. These cases are particularly significant because for the first time since the adoption of the Constitution wives of soldiers have been denied trial by jury in a court of law and forced to trial before courts-martial.

In No. 701 Mrs. Clarice Covert killed her husband, a sergeant in the United States Air Force, at an airbase in England. Mrs. Covert, who was not a member of the armed services, was residing on the base with her husband at the time. She was tried by a court-martial for murder under Article 118 of the Uniform Code of Military Justice (UCMJ).[1] The trial was on charges preferred by Air Force personnel and the court-martial was composed of Air Force officers. The court-martial asserted jurisdiction over Mrs. Covert under Article 2 (11) of the UCMJ,[2] which provides:

"The following persons are subject to this code:

.    .    .    .    .

"(11) Subject to the provisions of any treaty or agreement to which the United States is or may be a party or to any accepted rule of international law,

---

[1] 50 U. S. C. § 712.
[2] 50 U. S. C. § 552 (11).

4

all persons serving with, employed by, or accompanying the armed forces without the continental limits of the United States . . . ."

Counsel for Mrs. Covert contended that she was insane at the time she killed her husband, but the military tribunal found her guilty of murder and sentenced her to life imprisonment. The judgment was affirmed by the Air Force Board of Review, 16 CMR 465, but was reversed by the Court of Military Appeals, 6 USCMA 48, because of prejudicial errors concerning the defense of insanity. While Mrs. Covert was being held in this country pending a proposed retrial by court-martial in the District of Columbia, her counsel petitioned the District Court for a writ of habeas corpus to set her free on the ground that the Constitution forbade her trial by military authorities. Construing this Court's decision in *United States ex rel. Toth* v. *Quarles,* 350 U. S. 11, as holding that "a civilian is entitled to a civilian trial" the District Court held that Mrs. Covert could not be tried by court-martial and ordered her released from custody. The Government appealed directly to this Court under 28 U. S. C. § 1252. See 350 U. S. 985.

In No. 713 Mrs. Dorothy Smith killed her husband, an Army officer, at a post in Japan where she was living with him. She was tried for murder by a court-martial and despite considerable evidence that she was insane was found guilty and sentenced to life imprisonment. The judgment was approved by the Army Board of Review, 10 CMR 350, 13 CMR 307, and the Court of Military Appeals, 5 USCMA 314. Mrs. Smith was then confined in a federal penitentiary in West Virginia. Her father, respondent here, filed a petition for habeas corpus in a District Court for West Virginia. The petition charged that the court-martial was without jurisdiction because Article 2 (11) of the UCMJ was unconstitutional insofar as it authorized the trial of civilian dependents accom-

panying servicemen overseas. The District Court refused to issue the writ, 137 F. Supp. 806, and while an appeal was pending in the Court of Appeals for the Fourth Circuit we granted certiorari at the request of the Government, 350 U. S. 986.

The two cases were consolidated and argued last Term and a majority of the Court, with three Justices dissenting and one reserving opinion, held that military trial of Mrs. Smith and Mrs. Covert for their alleged offenses was constitutional. 351 U. S. 470, 487. The majority held that the provisions of Article III and the Fifth and Sixth Amendments which require that crimes be tried by a jury after indictment by a grand jury did not protect an American citizen when he was tried by the American Government in foreign lands for offenses committed there and that Congress could provide for the trial of such offenses in any manner it saw fit so long as the procedures established were reasonable and consonant with due process. The opinion then went on to express the view that military trials, as now practiced, were not unreasonable or arbitrary when applied to dependents accompanying members of the armed forces overseas. In reaching their conclusion the majority found it unnecessary to consider the power of Congress "To make Rules for the Government and Regulation of the land and naval Forces" under Article I of the Constitution.

Subsequently, the Court granted a petition for rehearing, 352 U. S. 901. Now, after further argument and consideration, we conclude that the previous decisions cannot be permitted to stand. We hold that Mrs. Smith and Mrs. Covert could not constitutionally be tried by military authorities.

I.

At the beginning we reject the idea that when the United States acts against citizens abroad it can do so free of the Bill of Rights. The United States is entirely

a creature of the Constitution.[3]   Its power and authority have no other source.   It can only act in accordance with all the limitations imposed by the Constitution.[4]   When the Government reaches out to punish a citizen who is abroad, the shield which the Bill of Rights and other parts of the Constitution provide to protect his life and liberty should not be stripped away just because he happens to be in another land.   This is not a novel concept.   To the contrary, it is as old as government.   It was recognized long before Paul successfully invoked his right as a Roman citizen to be tried in strict accordance with Roman law.   And many centuries later an English historian wrote:

> "In a Settled Colony the inhabitants have all the rights of Englishmen.   They take with them, in the first place, that which no Englishman can by expatriation put off, namely, allegiance to the Crown, the duty of obedience to the lawful commands of the Sovereign, and obedience to the Laws which Parliament may think proper to make with reference to such a Colony.   But, on the other hand, they take with them all the rights and liberties of British Subjects; all the rights and liberties as against the Prerogative of the Crown, which they would enjoy in this country." [5]

The rights and liberties which citizens of our country enjoy are not protected by custom and tradition alone, they have been jealously preserved from the encroach-

---

[3] *Martin* v. *Hunter's Lessee,* 1 Wheat. 304, 326; *Ex parte Milligan,* 4 Wall. 2, 119, 136–137; *Graves* v. *New York ex rel. O'Keefe,* 306 U. S. 466, 477; *Ex parte Quirin,* 317 U. S. 1, 25.

[4] *Marbury* v. *Madison,* 1 Cranch 137, 176–180; *Hawaii* v. *Mankichi,* 190 U. S. 197, 236–239 (Harlan, J., dissenting).

[5] 2 Clode, Military Forces of the Crown, 175.

ments of Government by express provisions of our written Constitution.[6]

Among those provisions, Art. III, § 2 and the Fifth and Sixth Amendments are directly relevant to these cases. Article III, § 2 lays down the rule that:

> "The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed; but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed."

The Fifth Amendment declares:

> "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; . . . ."

And the Sixth Amendment provides:

> "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . ."

The language of Art. III, § 2 manifests that constitutional protections for the individual were designed to restrict the United States Government when it acts outside of this country, as well as here at home. After declaring that *all* criminal trials must be by jury, the section states that when a crime is "not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed." If

---

[6] Cf. *Barron* v. *Baltimore,* 7 Pet. 243, 250.

this language is permitted to have its obvious meaning,[7] § 2 is applicable to criminal trials outside of the States as a group without regard to where the offense is committed or the trial held.[8] From the very first Congress, federal statutes have implemented the provisions of § 2 by providing for trial of murder and other crimes committed outside the jurisdiction of any State "in the district where the offender is apprehended, or into which he may first be brought." [9] The Fifth and Sixth Amendments, like Art. III, § 2, are also all inclusive with their sweeping references to "no person" and to "all criminal prosecutions."

This Court and other federal courts have held or asserted that various constitutional limitations apply to the Government when it acts outside the continental United States.[10] While it has been suggested that only

---

[7] This Court has constantly reiterated that the language of the Constitution where clear and unambiguous must be given its plain evident meaning. See, e. g., *Ogden* v. *Saunders,* 12 Wheat. 213, 302–303; *Lake County* v. *Rollins,* 130 U. S. 662, 670–671. In *United States* v. *Sprague,* 282 U. S. 716, 731–732, the Court said:

"The Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning; where the intention is clear there is no room for construction and no excuse for interpolation or addition. . . . The fact that an instrument drawn with such meticulous care and by men who so well understood how to make language fit their thought does not contain any such limiting phrase . . . is persuasive evidence that no qualification was intended."

[8] According to Madison, the section was intended "to provide for trial by jury of offences committed out of any State." 3 Madison Papers (Gilpin ed. 1841) 1441.

[9] 1 Stat. 113–114. With slight modifications this provision is now 18 U. S. C. § 3238.

[10] See, e. g., *Balzac* v. *Porto Rico,* 258 U. S. 298, 312–313 (Due Process of Law); *Downes* v. *Bidwell,* 182 U. S. 244, 277 (First Amendment, Prohibition against Ex Post Facto Laws or Bills of

those constitutional rights which are "fundamental" protect Americans abroad,[11] we can find no warrant, in logic or otherwise, for picking and choosing among the remarkable collection of "Thou shalt nots" which were explicitly fastened on all departments and agencies of the Federal Government by the Constitution and its Amendments. Moreover, in view of our heritage and the history of the adoption of the Constitution and the Bill of Rights, it seems peculiarly anomalous to say that trial before a civilian judge and by an independent jury picked from the common citizenry is not a fundamental right.[12]   As Blackstone wrote in his Commentaries:

> ". . . the trial by jury ever has been, and I trust ever will be, looked upon as the glory of the English law.   And if it has so great an advantage over others in regulating civil property, how much must that advantage be heightened when it is applied to criminal cases! . . .   [I]t is the most transcendent privilege which any subject can enjoy, or wish for, that he cannot be affected either in his property, his

---

Attainder); *Mitchell* v. *Harmony,* 13 How. 115, 134 (Just Compensation Clause of the Fifth Amendment); *Best* v. *United States,* 184 F. 2d 131, 138 (Fourth Amendment); *Eisentrager* v. *Forrestal,* 84 U. S. App. D. C. 396, 174 F. 2d 961 (Right to Habeas Corpus), rev'd on other grounds *sub nom. Johnson* v. *Eisentrager,* 339 U. S. 763; *Turney* v. *United States,* 126 Ct. Cl. 202, 115 F. Supp. 457, 464 (Just Compensation Clause of the Fifth Amendment).

[11] See *Dorr* v. *United States,* 195 U. S. 138, 144–148.

[12] The right to trial by jury in a criminal case is twice guaranteed by the Constitution.   It is common knowledge that the fear that jury trial might be abolished was one of the principal sources of objection to the Federal Constitution and was an important reason for the adoption of the Bill of Rights.   The Sixth Amendment reaffirmed the right to trial by jury in criminal cases and the Seventh Amendment insured such trial in civil controversies.   See 2 Elliot's Debates (2d ed. 1836) *passim; 3 id. passim.*

liberty, or his person, but by the unanimous consent
of twelve of his neighbours and equals." [13]

Trial by jury in a court of law and in accordance with
traditional modes of procedure after an indictment by
grand jury has served and remains one of our most vital
barriers to governmental arbitrariness. These elemental
procedural safeguards were embedded in our Constitution
to secure their inviolateness and sanctity against the
passing demands of expediency or convenience.

The keystone of supporting authorities mustered by
the Court's opinion last June to justify its holding that
Art. III, § 2, and the Fifth and Sixth Amendments did not
apply abroad was *In re Ross,* 140 U. S. 453. The *Ross*
case is one of those cases that cannot be understood
except in its peculiar setting; even then, it seems highly
unlikely that a similar result would be reached today.
Ross was serving as a seaman on an American ship in
Japanese waters. He killed a ship's officer, was seized
and tried before a consular "court" in Japan. At that
time, statutes authorized American consuls to try Amer-
ican citizens charged with committing crimes in Japan
and certain other "non-Christian" countries. [14] These

---

[13] 3 Blackstone's Commentaries 379. As to the importance of trial
by jury, see also *Ex parte Milligan,* 4 Wall. 2, 122–123; *Thompson* v.
*Utah,* 170 U. S. 343, 349–350; *United States ex rel. Toth* v. *Quarles,*
350 U. S. 11, 16, 18–19; 2 Kent's Commentaries, 3–10; The Federalist,
No. 83 (Hamilton); 2 Wilson's Works (Andrews ed. 1896) 222.
De Tocqueville observed:
"The institution of the jury . . . places the real direction of society
in the hands of the governed, or of a portion of the governed, and
not in that of the government. . . . He who punishes the criminal
is . . . the real master of society. . . . All the sovereigns who have
chosen to govern by their own authority, and to direct society instead
of obeying its directions, have destroyed or enfeebled the institution
of the jury." 1 De Tocqueville, Democracy in America (Reeve trans.
1948 ed.), 282–283.

[14] Rev. Stat. §§ 4083–4130 (1878).

statutes provided that the laws of the United States were to govern the trial except:

> ". . . where such laws are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies, the common law and the law of equity and admiralty shall be extended in like manner over such citizens and others in those countries; and if neither the common law, nor the law of equity or admiralty, nor the statutes of the United States, furnish appropriate and sufficient remedies, the ministers in those countries, respectively, shall, by decrees and regulations which shall have the force of law, supply such defects and deficiencies." [15]

The consular power approved in the *Ross* case was about as extreme and absolute as that of the potentates of the "non-Christian" countries to which the statutes applied. Under these statutes consuls could and did make the criminal laws, initiate charges, arrest alleged offenders, try them, and after conviction take away their liberty or their life—sometimes at the American consulate. Such a blending of executive, legislative, and judicial powers in one person or even in one branch of the Government is ordinarily regarded as the very acme of absolutism.[16] Nevertheless, the Court sustained Ross' conviction by the consul. It stated that constitutional

---

[15] *Id.*, § 4086.

[16] Secretary of State Blaine referred to these consular powers as "greater than ever the Roman law conferred on the pro-consuls of the empire, to an officer who, under the terms of the commitment of this astounding trust, is practically irresponsible." S. Exec. Doc. No. 21, 47th Cong., 1st Sess. 4. Seward, at a time when he was Consul-General, declared: "[t]here is no reason, *excepting the absence of appropriate legislation,* why American citizens in China, charged with grave offenses, should not have the privilege of a trial by jury as elsewhere throughout the world where the institution of civilization prevails." *Id.*, at 7.

protections applied "only to citizens and others within the United States, or who are brought there for trial for alleged offences committed elsewhere, and not to residents or temporary sojourners abroad." [17]   Despite the fact that it upheld Ross' conviction under United States laws passed pursuant to asserted constitutional authority, the Court went on to make a sweeping declaration that "[t]he Constitution can have no operation in another country." [18]

The *Ross* approach that the Constitution has no applicability abroad has long since been directly repudiated by numerous cases.[19]   That approach is obviously erroneous if the United States Government, which has no power except that granted by the Constitution, can and does try citizens for crimes committed abroad.[20]   Thus the *Ross* case rested, at least in substantial part, on a fundamental misconception and the most that can be said in support of the result reached there is that the consular court jurisdiction had a long history antedating the adoption of the Constitution.   The Congress has recently buried the consular system of trying Americans.[21]   We are not willing to jeopardize the lives and liberties of Americans by disinterring it.   At best, the *Ross* case should be left as a relic from a different era.

The Court's opinion last Term also relied on the "Insular Cases" to support its conclusion that Article III and the Fifth and Sixth Amendments were not applicable

---

[17] *In re Ross, supra,* at 464.

[18] *Ibid.*

[19] See cases cited in note 10, *supra.*

[20] See, *e. g., Kawakita* v. *United States,* 343 U. S. 717; *United States* v. *Flores,* 289 U. S. 137; *United States* v. *Bowman,* 260 U. S. 94; *Chandler* v. *United States,* 171 F. 2d 921, cert. denied, 336 U. S. 918.

[21] 70 Stat. 773.

to the trial of Mrs. Smith and Mrs. Covert.[22]   We believe that reliance was misplaced.   The "Insular Cases," which arose at the turn of the century, involved territories which had only recently been conquered or acquired by the United States.   These territories, governed and regulated by Congress under Art. IV, § 3,[23] had entirely different cultures and customs from those of this country. This Court, although closely divided,[24] ruled that certain constitutional safeguards were not applicable to these territories since they had not been "expressly or impliedly incorporated" into the Union by Congress.   While conceding that "fundamental" constitutional rights applied everywhere,[25] the majority found that it would disrupt long-established practices and would be inexpedient to require a jury trial after an indictment by a grand jury in the insular possessions.[26]

---

[22] *Downes* v. *Bidwell*, 182 U. S. 244; *Hawaii* v. *Mankichi*, 190 U. S. 197; *Dorr* v. *United States*, 195 U. S. 138; *Balzac* v. *Porto Rico*, 258 U. S. 298.

[23] "The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States; . . . ."

[24] *Downes* v. *Bidwell*, 182 U. S. 244, the first of the "Insular Cases" was decided over vigorous dissents from Mr. Chief Justice Fuller, joined by Justices Harlan, Brewer, and Peckham, and from Mr. Justice Harlan separately.   The four dissenters took the position that all the restraints of the Bill of Rights and of other parts of the Constitution were applicable to the United States Government wherever it acted.   This was the position which the Court had consistently followed prior to the "Insular Cases."   See, *e. g., Thompson* v. *Utah*, 170 U. S. 343; *Callan* v. *Wilson*, 127 U. S. 540.

[25] As to the great significance of the right to trial by jury see text at note 13, *supra,* and the authorities referred to in that note.

[26] Later the Court held that once a territory become "incorporated" all of the constitutional protections became "applicable."   See, *e. g., Rassmussen* v. *United States*, 197 U. S. 516, 520–521.

The "Insular Cases" can be distinguished from the present cases in that they involved the power of Congress to provide rules and regulations to govern temporarily territories with wholly dissimilar traditions and institutions whereas here the basis for governmental power is American citizenship. None of these cases had anything to do with military trials and they cannot properly be used as vehicles to support an extension of military jurisdiction to civilians. Moreover, it is our judgment that neither the cases nor their reasoning should be given any further expansion. The concept that the Bill of Rights and other constitutional protections against arbitrary government are inoperative when they become inconvenient or when expediency dictates otherwise is a very dangerous doctrine and if allowed to flourish would destroy the benefit of a written Constitution and undermine the basis of our Government. If our foreign commitments become of such nature that the Government can no longer satisfactorily operate within the bounds laid down by the Constitution, that instrument can be amended by the method which it prescribes.[27] But we have no authority, or inclination, to read exceptions into it which are not there.[28]

---

[27] It may be said that it is difficult to amend the Constitution. To some extent that is true. Obviously the Founders wanted to guard against hasty and ill-considered changes in the basic charter of government. But if the necessity for alteration becomes pressing, or if the public demand becomes strong enough, the Constitution can and has been promptly amended. The Eleventh Amendment was ratified within less than two years after the decision in *Chisholm* v. *Georgia*, 2 Dall. 419. And more recently the Twenty-First Amendment, repealing nationwide prohibition, became part of the Constitution within ten months after congressional action. On the average it has taken the States less than two years to ratify each of the twenty-two amendments which have been made to the Constitution.

[28] In 1881, Senator Carpenter, while attacking the consular courts "as a disgrace to this nation" because they deprived citizens of the

## II.

At the time of Mrs. Covert's alleged offense, an executive agreement was in effect between the United States and Great Britain which permitted United States' military courts to exercise exclusive jurisdiction over offenses committed in Great Britain by American servicemen or their dependents.[29]  For its part, the United States agreed that these military courts would be willing and able to try and to punish all offenses against the laws of Great Britain by such persons.  In all material respects, the same situation existed in Japan when Mrs. Smith

---

"fundamental and essential" rights to indictment and trial by jury, declared:

"If we are too mean as a nation to pay the expense of observing the Constitution in China, then let us give up our concessions in China and come back to as much of the Constitution as we can afford to carry out."  11 Cong. Rec. 410.

[29] Executive Agreement of July 27, 1942, 57 Stat. 1193.  The arrangement now in effect in Great Britain and the other North Atlantic Treaty Organization nations, as well as in Japan, is the NATO Status of Forces Agreement, 4 U. S. Treaties and Other International Agreements 1792, T. I. A. S. 2846, which by its terms gives the foreign nation primary jurisdiction to try dependents accompanying American servicemen for offenses which are violations of the law of both the foreign nation and the United States.  Art. VII, §§ 1 (b), 3 (a).  The foreign nation has exclusive criminal jurisdiction over dependents for offenses which only violate its laws.  Art. VII, § 2 (b).  However, the Agreement contains provisions which require that the foreign nations provide procedural safeguards for our nationals tried under the terms of the Agreement in their courts.  Art. VII, § 9.  Generally, see Note, 70 Harv. L. Rev. 1043.

Apart from those persons subject to the Status of Forces and comparable agreements and certain other restricted classes of Americans, a foreign nation has plenary criminal jurisdiction, of course, over all Americans—tourists, residents, businessmen, government employees and so forth—who commit offenses against its laws within its territory.

killed her husband.[30]   Even though a court-martial does
not give an accused trial by jury and other Bill of Rights
protections, the Government contends that Art. 2 (11) of
the UCMJ, insofar as it provides for the military trial
of dependents accompanying the armed forces in Great
Britain and Japan, can be sustained as legislation which is
necessary and proper to carry out the United States' obli-
gations under the international agreements made with
those countries.   The obvious and decisive answer to
this, of course, is that no agreement with a foreign
nation can confer power on the Congress, or on any other
branch of Government, which is free from the restraints
of the Constitution.

Article VI, the Supremacy Clause of the Constitution,
declares:

> "This Constitution, and the Laws of the United
> States which shall be made in Pursuance thereof;
> and all Treaties made, or which shall be made, under
> the Authority of the United States, shall be the
> supreme Law of the Land; . . . ."

There is nothing in this language which intimates that
treaties and laws enacted pursuant to them do not
have to comply with the provisions of the Constitution.
Nor is there anything in the debates which accompanied
the drafting and ratification of the Constitution which
even suggests such a result.   These debates as well as the
history that surrounds the adoption of the treaty pro-
vision in Article VI make it clear that the reason treaties
were not limited to those made in "pursuance" of the
Constitution was so that agreements made by the United
States under the Articles of Confederation, including the
important peace treaties which concluded the Revolu-

---

[30] See Administrative Agreement, 3 U. S. Treaties and Other Inter-
national Agreements 3341, T. I. A. S. 2492.

tionary War, would remain in effect.[31]   It would be manifestly contrary to the objectives of those who created the Constitution, as well as those who were responsible for the Bill of Rights—let alone alien to our entire constitutional history and tradition—to construe Article VI as permitting the United States to exercise power under an international agreement without observing constitutional prohibitions.[32]   In effect, such construction would permit amendment of that document in a manner not sanctioned by Article V.   The prohibitions of the Constitution were designed to apply to all branches of the National Government and they cannot be nullified by the Executive or by the Executive and the Senate combined.

There is nothing new or unique about what we say here.   This Court has regularly and uniformly recognized the supremacy of the Constitution over a treaty.[33]   For example, in *Geofroy v. Riggs,* 133 U. S. 258, 267, it declared:

"The treaty power, as expressed in the Constitution, is in terms unlimited except by those restraints which are found in that instrument against the action of the government or of its departments, and those arising from the nature of the government itself and of that of the States.   It would not be contended that it extends so far as to authorize what the Constitution forbids, or a change in the character of the

---

[31] See the references collected in 4 Farrand, Records of the Federal Convention (Rev. ed. 1937), 123.

[32] See the discussion in the Virginia Convention on the adoption of the Constitution, 3 Elliot's Debates (1836 ed.) 500–519.

[33] *E. g., United States* v. *Minnesota,* 270 U. S. 181, 207–208; *Holden* v. *Joy,* 17 Wall. 211, 242–243; *The Cherokee Tobacco,* 11 Wall. 616, 620–621; *Doe* v. *Braden,* 16 How. 635, 657.   Cf. *Marbury* v. *Madison,* 1 Cranch 137, 176–180.   We recognize that executive agreements are involved here but it cannot be contended that such an agreement rises to greater stature than a treaty.

government or in that of one of the States, or a cession of any portion of the territory of the latter, without its consent."

This Court has also repeatedly taken the position that an Act of Congress, which must comply with the Constitution, is on a full parity with a treaty, and that when a statute which is subsequent in time is inconsistent with a treaty, the statute to the extent of conflict renders the treaty null.[34] It would be completely anomalous to say that a treaty need not comply with the Constitution when such an agreement can be overridden by a statute that must conform to that instrument.

There is nothing in *Missouri* v. *Holland,* 252 U. S. 416, which is contrary to the position taken here. There the Court carefully noted that the treaty involved was not inconsistent with any specific provision of the Constitution. The Court was concerned with the Tenth Amendment which reserves to the States or the people all power not delegated to the National Government. To the extent that the United States can validly make treaties, the people and the States have delegated their power to the National Government and the Tenth Amendment is no barrier.[35]

In summary, we conclude that the Constitution in its entirety applied to the trials of Mrs. Smith and Mrs.

---

[34] In *Whitney* v. *Robertson,* 124 U. S. 190, the Court stated, at p. 194: "By the Constitution a treaty is placed on the same footing, and made of like obligation, with an act of legislation. Both are declared by that instrument to be the supreme law of the land, and no superior efficacy is given to either over the other. . . . [I]f the two are inconsistent, the one last in date will control the other . . . ." *Head Money Cases,* 112 U. S. 580; *Botiller* v. *Dominguez,* 130 U. S. 238; *Chae Chan Ping* v. *United States,* 130 U. S. 581. See *Clark* v. *Allen,* 331 U. S. 503, 509–510; *Moser* v. *United States,* 341 U. S. 41, 45.

[35] See *United States* v. *Darby,* 312 U. S. 100, 124–125, and the authorities collected there.

Covert. Since their court-martial did not meet the requirements of Art. III, § 2 or the Fifth and Sixth Amendments we are compelled to determine if there is anything *within* the Constitution which authorizes the military trial of dependents accompanying the armed forces overseas.

### III.

Article I, § 8, cl. 14 empowers Congress "To make Rules for the Government and Regulation of the land and naval Forces." It has been held that this creates an exception to the normal method of trial in civilian courts as provided by the Constitution and permits Congress to authorize military trial of members of the armed services without all the safeguards given an accused by Article III and the Bill of Rights.[36]    But if the language of Clause 14 is given its natural meaning,[37] the power granted does not extend to civilians—even though they may be dependents living with servicemen on a military base.[38]    The term "land and naval Forces" refers to per-

---

[36] *Dynes* v. *Hoover,* 20 How. 65; *Ex parte Reed,* 100 U. S. 13.

[37] See note 7, *supra.*

[38] Colonel Winthrop, who has been called the "Blackstone of Military Law," made the following statement in his treatise:
"Can [the power of Congress to raise, support, and govern the military forces] be held to include the raising or constituting, and the governing *nolens volens,* in time of *peace,* as a part of the army, of a class of persons who are under no contract for military service, . . . who render no military service, perform no military duty, receive no military pay, but are and remain civilians in every sense and for every capacity . . . . In the opinion of the author, such a range of control is certainly beyond the power of Congress under [the Constitution.   The Fifth Amendment] clearly distinguishes the military from the civil class as separate communities. It recognizes no third class which is part civil and part military . . . and it cannot be perceived how Congress can create such a class, without a disregard of the letter and spirit of the organic law." Winthrop, Military Law and Precedents (2d ed., Reprint 1920), 106.

sons who are members of the armed services and not to their civilian wives, children and other dependents. It seems inconceivable that Mrs. Covert or Mrs. Smith could have been tried by military authorities as members of the "land and naval Forces" had they been living on a military post in this country. Yet this constitutional term surely has the same meaning everywhere. The wives of servicemen are no more members of the "land and naval Forces" when living at a military post in England or Japan than when living at a base in this country or in Hawaii or Alaska.

The Government argues that the Necessary and Proper Clause when taken in conjunction with Clause 14 allows Congress to authorize the trial of Mrs. Smith and Mrs. Covert by military tribunals and under military law. The Government claims that the two clauses together constitute a broad grant of power "without limitation" authorizing Congress to subject all persons, civilians and soldiers alike, to military trial if "necessary and proper" to govern and regulate the land and naval forces. It was on a similar theory that Congress once went to the extreme of subjecting persons who made contracts with the military to court-martial jurisdiction with respect to frauds related to such contracts.[39] In the only judicial test a Circuit Court held that the legislation was patently unconstitutional. *Ex parte Henderson*, 11 Fed. Cas. 1067, No. 6,349.

It is true that the Constitution expressly grants Congress power to make all rules necessary and proper to govern and regulate those persons who are serving in the "land and naval Forces." But the Necessary and Proper

---

[39] 12 Stat. 696. For debates showing sharp attacks on the constitutionality of this legislation see Cong. Globe, 37th Cong., 3d Sess. 952–958. The legislation was subsequently repealed. Rev. Stat. (1878 ed.) §§ 1342, 5596.

Clause cannot operate to extend military jurisdiction to any group of persons beyond that class described in Clause 14—"the land and naval Forces." Under the grand design of the Constitution civilian courts are the normal repositories of power to try persons charged with crimes against the United States. And to protect persons brought before these courts, Article III and the Fifth, Sixth, and Eighth Amendments establish the right to trial by jury, to indictment by a grand jury and a number of other specific safeguards. By way of contrast the jurisdiction of military tribunals is a very limited and extraordinary jurisdiction derived from the cryptic language in Art. I, § 8, and, at most, was intended to be only a narrow exception to the normal and preferred method of trial in courts of law.[40] Every extension of military jurisdiction is an encroachment on the jurisdiction of the civil courts, and, more important, acts as a deprivation of the right to jury trial and of other treasured constitutional protections. Having run up against the steadfast bulwark of the Bill of Rights, the Necessary and Proper Clause cannot extend the scope of Clause 14.

Nothing said here contravenes the rule laid down in *McCulloch* v. *Maryland,* 4 Wheat. 316, at 421, that:

> "Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional."

---

[40] As the Government points out in its brief on rehearing:

"The clause granting Congress power to make rules for the government and regulation of the land and naval forces was included in the final draft of the Constitution without either discussion or debate. . . . Neither the original draft presented to the convention nor the draft submitted by the 'Committee of Detail' contained the clause. 5 Elliot's Debates 130, 379."

In *McCulloch* this Court was confronted with the problem of determining the scope of the Necessary and Proper Clause in a situation where no specific restraints on governmental power stood in the way. Here the problem is different. Not only does Clause 14, by its terms, limit military jurisdiction to members of the "land and naval Forces," but Art. III, § 2 and the Fifth and Sixth Amendments require that certain express safeguards, which were designed to protect persons from oppressive governmental practices, shall be given in criminal prosecutions—safeguards which cannot be given in a military trial. In the light of these as well as other constitutional provisions, and the historical background in which they were formed, military trial of civilians is inconsistent with both the "letter and spirit of the constitution."

Further light is reflected on the scope of Clause 14 by the Fifth Amendment. That Amendment which was adopted shortly after the Constitution reads:

> "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, *except in cases arising in the land or naval forces,* or in the Militia, when in actual service in time of War or public danger; . . . ." (Emphasis added.)

Since the exception in this Amendment for "cases arising in the land or naval forces" was undoubtedly designed to correlate with the power granted Congress to provide for the "Government and Regulation" of the armed services, it is a persuasive and reliable indication that the authority conferred by Clause 14 does not encompass persons who cannot fairly be said to be "in" the military service.

Even if it were possible, we need not attempt here to precisely define the boundary between "civilians" and members of the "land and naval Forces." We recognize

that there might be circumstances where a person could be "in" the armed services for purposes of Clause 14 even though he had not formally been inducted into the military or did not wear a uniform. But the wives, children and other dependents of servicemen cannot be placed in that category, even though they may be accompanying a serviceman abroad at Government expense and receiving other benefits from the Government.[41] We have no difficulty in saying that such persons do not lose their civilian status and their right to a civilian trial because the Government helps them live as members of a soldier's family.

The tradition of keeping the military subordinate to civilian authority may not be so strong in the minds of this generation as it was in the minds of those who wrote the Constitution. The idea that the relatives of soldiers could be denied a jury trial in a court of law and instead be tried by court-martial under the guise of regulating the armed forces would have seemed incredible to those men, in whose lifetime the right of the military to try *soldiers* for any offenses in time of peace had only been grudgingly conceded.[42] The Founders envisioned the

---

[41] Most of the benefits received by dependents accompanying servicemen overseas are also enjoyed by those accompanying servicemen in this country—for example, quarters, commissary privileges, medical benefits, free transportation of household effects and so forth.

[42] In the Mutiny Acts, first passed in 1688, 1 Will. & Mar., c. 5, the English Parliament reluctantly departed from the Common Law, see note 44, *infra,* and granted the Army authority in time of peace to try soldiers—initially for only the offenses of mutiny and desertion in time of civil insurrection. In the beginning this limited court-martial jurisdiction was granted only for periods of four months; later it was granted from year to year. See 1 Clode, Military Forces of the Crown, 19–21, 55–61, 76–78, 142–166, 499–501, 519–520.

Initially the Mutiny Acts did not apply to the American Colonies. In 1713, Parliament, for the first time, authorized the trial of soldiers by courts-martial during peacetime in the overseas dominions. 12

army as a necessary institution, but one dangerous to liberty if not confined within its essential bounds. Their fears were rooted in history. They knew that ancient republics had been overthrown by their military leaders.[43] They were familiar with the history of Seventeenth Century England, where Charles I tried to govern through the army and without Parliament. During this attempt, contrary to the Common Law, he used courts-martial to try soldiers for certain non-military offenses.[44]

Anne, c. 13, § 43; 1 Geo. I, c. 34. See the British War Office, Manual of Military Law (7th ed. 1929), 10–14. For colonial reaction to military trial of soldiers in this country in the period preceding the revolution see text at note 49 and the authorities referred to there.

It was not until 1863 that Congress first authorized the trial of soldiers, *in wartime*, for civil crimes such as murder, arson, rape, etc., by courts-martial. 12 Stat. 736. Previously the soldiers had been turned over to state authorities for trial in state courts. In *Coleman* v. *Tennessee*, 97 U. S. 509, this Court declined to construe the 1863 statute as depriving civilian courts of a concurrent jurisdiction to try soldiers for crimes. The Court said: "With the known hostility of the American people to any interference by the military with the regular administration of justice in the civil courts, no such intention should be ascribed to Congress in the absence of clear and direct language to that effect." *Id.*, at 514.

[43] Washington warned that "Mercenary Armies . . . have at one time or another subverted the liberties of allmost all the Countries they have been raised to defend . . . ." 26 Writings of Washington (Fitzpatrick ed.) 388. Madison in The Federalist, No. 41, cautioned: "[T]he liberties of Rome proved the final victim to her military triumphs; and . . . the liberties of Europe, as far as they ever existed, have, with few exceptions, been 'the price of her military establishments."

[44] The Common Law made no distinction between the crimes of soldiers and those of civilians in time of peace. All subjects were tried alike by the same civil courts so "if a life-guardsman deserted, he could only be sued for breach of contract, and if he struck his officer he was only liable to an indictment or an action of battery." 2 Campbell, Lives of the Chief Justices (1st ed. 1849), 91. In time of

This court-martialing of soldiers in peacetime evoked strong protests from Parliament.[45] The reign of Charles I was followed by the rigorous military rule of Oliver Cromwell. Later, James II used the Army in his fight

---

war the Common Law recognized an exception that permitted armies to try soldiers "in the field." The pages of English history are filled with the struggle of the common-law courts and Parliament against the jurisdiction of military tribunals. See, for example, 8 Richard II, c. 5; 13 Richard II, cc. 2, 5; 1 Henry IV, c. 14; 18 Henry VI, c. 19; 3 Car. I, c. 1. See 3 Rushworth, Historical Collections, App. 76–81.

During the Middle Ages the Court of the Constable and Marshal exercised jurisdiction over offenses committed by soldiers in time of war and over cases "of Death or Murder committed beyond the Sea." Hale, History and Analysis of the Common Law of England (1st ed. 1713), 37–42. As time passed the jurisdiction of this court was steadily narrowed by Parliament and the common-law courts so that Lord Chief Justice Hale (1609–1676) could write that the court "has been long disused upon great Reasons." Hale, *supra,* 42. As the Court of the Constable and Marshal fell into disuse and disrepute jurisdiction over soldiers in time of war was assumed by commissions appointed by the King or by military councils.

In *Mostyn v. Fabrigas,* 1 Cowp. 161, at 176, Lord Mansfield observed that "tradesmen who followed the train [of the British Army at Gibraltar], were not liable to martial law." (The distinction between the terms "martial law" and "military law" is of relatively recent origin. Early writers referred to all trials by military authorities as "martial law.")

[45] In 1627, the Petition of Right, 3 Car. I, c. 1 (Pickering, Vol. VII, p. 319, 1763) protested:
*"nevertheless of late time divers commissions under your Majesty's great seal have issued forth, by which certain persons have been assigned and appointed commissioners with power and authority to proceed within the land, according to the justice of martial law, against such soldiers or mariners, or other dissolute persons joining with them, as should commit any murder, robbery, felony, mutiny or other outrage or misdemeanor whatsoever, and by such summary course and order as is agreeable to martial law, and as is used in armies in time of war, to proceed to the trial and condemnation of*

against Parliament and the people. He promulgated Articles of War (strangely enough relied on in the Government's brief) authorizing the trial of soldiers for non-military crimes by courts-martial.[46] This action hastened the revolution that brought William and Mary to the throne upon their agreement to abide by a Bill of Rights which, among other things, protected the right of trial by jury.[47] It was against this general background that two of the greatest English jurists, Lord Chief Justice Hale and Sir William Blackstone—men who exerted considerable influence on the Founders—expressed sharp hostility to any expansion of the jurisdiction of military courts. For instance, Blackstone went so far as to assert:

> "For martial law, which is built upon no settled principles, but is entirely arbitrary in its decisions, is, as Sir Matthew Hale observes, in truth and reality no law, but something indulged rather than allowed as a law. The necessity of order and discipline in an army is the only thing which can give it countenance;

---

*such offenders, and them to cause to be executed and put to death according to the law martial:*

. . . . .

"[Your Majesty's subjects] do therefore humbly pray your most excellent Majesty . . . that the aforesaid commissions, for proceeding by martial law, may be revoked and annulled; and that hereafter no commissions of like nature may issue forth to any person or persons whatsoever to be executed as aforesaid, lest by colour of them any of your Majesty's subjects be destroyed, or put to death contrary to the laws and franchise of the land." See also 1 Clode, Military Forces of the Crown, 18–20, 424–425.

[46] These Articles are set out in Winthrop, Military Law and Precedents (2d ed., Reprint 1920), 920. James II also removed Lord Chief Justice Herbert and Sir John Holt (later Lord Chief Justice) from the bench for holding that military trials in peacetime were illegal and contrary to the law of the land. See 2 Campbell, Lives of the Chief Justices (1st ed. 1849), 90–93, 129.

[47] 1 Will. & Mar., c. 2.

and therefore it ought not to be permitted in time of peace, when the king's courts are open for all persons to receive justice according to the laws of the land." [48]

The generation that adopted the Constitution did not distrust the military because of past history alone. Within their own lives they had seen royal governors sometimes resort to military rule. British troops were quartered in Boston at various times from 1768 until the outbreak of the Revolutionary War to support unpopular royal governors and to intimidate the local populace. The trial of *soldiers* by courts-martial and the interference of the military with the civil courts aroused great anxiety and antagonism not only in Massachusetts but throughout the colonies. For example, Samuel Adams in 1768 wrote:

". . . [I]s it not enough for us to have seen soldiers and mariners forejudged of life, and executed within the body of the county by martial law? Are citizens

---

[48] 1 Blackstone's Commentaries 413. And Hale in much the same vein wrote:

"*First,* That in Truth and Reality [martial law] is not a Law, but something indulged rather than allowed as a Law; the Necessity of Government, Order and Discipline in an Army, is that only which can give those Laws a Countenance, . . . .

"*Secondly,* This indulged Law was only to extend to Members of the Army, or to those of the opposite Army, and never was so much indulged as intended to be (executed or) exercised upon others; for others who were not listed under the Army had no Colour of Reason to be bound by Military Constitutions, applicable only to the Army; whereof they were not Parts, but they were to be order'd and govern'd according to the Laws to which they were subject, though it were a Time of War.

"*Thirdly,* That the Exercise of Martial Law, whereby any Person should lose his Life or Member, or Liberty, may not be permitted in Time of Peace, when the Kings Courts are open for all Persons to receive Justice, according to the Laws of the Land." Hale, History and Analysis of the Common Law of England (1st ed. 1713), 40–41.

28

to be called upon, threatened, ill-used at the will of the soldiery, and put under arrest, by pretext of the law military, in breach of the fundamental rights of subjects, and contrary to the law and franchise of the land? . . . Will the spirits of people as yet unsubdued by tyranny, unawed by the menaces of arbitrary power, submit to be governed by military force? No! Let us rouse our attention to the common law,—which is our birthright, our great security against all kinds of insult and oppression . . . ." [49]

Colonials had also seen the right to trial by jury subverted by acts of Parliament which authorized courts of admiralty to try alleged violations of the unpopular

[49] 1 Wells, The Life and Public Services of Samuel Adams, 231. See also Dickerson, Boston Under Military Rule; Report of Boston Committee of Correspondence (November 20, 1772), "A List of Infringements and Violations of Rights," in Morison, The American Revolution 1764–1788, 91; Declaration and Resolves of the First Continental Congress in 1 Journals of the Continental Congress (Ford ed.) 63–73.

In June 1775, General Gage, then Royal Governor of Massachusetts Colony, declared martial law in Boston and its environs. The Continental Congress denounced this effort to supersede the course of the common law and to substitute the law martial. Declaration of Causes of Taking Up Arms, in 2 American Archives, Fourth Series (Force ed.), 1865, 1868.

In November 1775, Norfolk, Virginia, also was placed under martial law by the Royal Governor. The Virginia Assembly denounced this imposition of the "most execrable of all systems, the law martial," as in "direct violation of the Constitution, and the laws of this country." 4 id., 81–82.

And the Constitution adopted by the Provincial Congress of South Carolina on March 26, 1776, protested: ". . . governors and others bearing the royal commission in the colonies [have] . . . dispensed with the law of the land, and substituted the law martial in its stead; . . . ." Thorpe, The Federal and State Constitutions, 3242.

"Molasses" and "Navigation" Acts.[50] This gave the admiralty courts jurisdiction over offenses historically triable only by a jury in a court of law and aroused great resentment throughout the colonies.[51] As early as 1765 delegates from nine colonies meeting in New York asserted in a "Declaration of Rights" that trial by jury was the "inherent and invaluable" right of every citizen in the colonies.[52]

With this background it is not surprising that the Declaration of Independence protested that George III had "affected to render the Military independent of and superior to the Civil Power" and that Americans had been deprived in many cases of "the benefits of Trial by Jury." [53] And those who adopted the Constitution embodied their profound fear and distrust of military power, as well as their determination to protect trial by jury, in the Constitution and its Amendments.[54] Perhaps they

[50] 4 Geo. III, c. 15; 8 Geo. III, c. 22.

[51] See 4 Benedict, American Admiralty (6th ed. 1940), §§ 672–704; Harper, The English Navigation Laws, 184–196; 9 John Adams, Works, 318–319.

Jefferson in 1775 protested: "[Parliament has] extended the jurisdiction of the courts of admiralty beyond their antient limits thereby depriving us of the inestimable right of trial by jury in cases affecting both life and property and subjecting both to the arbitrary decision of a single and dependent judge." 2 Journals of the Continental Congress (Ford ed.) 132.

[52] 43 Harvard Classics 147, 148.

[53] State constitutions adopted during this period generally contained provisions protecting the right to trial by jury and warning against the military. See Thorpe, The Federal and State Constitutions, (Delaware) 569, (Maryland) 1688, (Massachusetts) 1891–1892, (North Carolina) 2787–2788, (Pennsylvania) 3083, (South Carolina) 3257, (Virginia) 3813–3814.

[54] See Art. I, §§ 8, 9; Art. II, § 2; Art. III; Amendments II, III, V, VI of the Constitution. See Madison, The Debates in the Federal

were aware that memories fade and hoped that in this way they could keep the people of this Nation from having to fight again and again the same old battles for individual freedom.

In light of this history, it seems clear that the Founders had no intention to permit the trial of civilians in military courts, where they would be denied jury trials and other constitutional protections, merely by giving Congress the power to make rules which were "necessary and proper" for the regulation of the "land and naval Forces." Such a latitudinarian interpretation of these clauses would be at war with the well-established purpose of the Founders to keep the military strictly within its proper sphere, subordinate to civil authority. The Constitution does not say that Congress can regulate "the land and naval Forces and all other persons whose regulation might have some relationship to maintenance of the land and naval Forces." There is no indication that the Founders contemplated setting up a rival system of military courts to compete with civilian courts for jurisdiction over civilians who might have some contact or relationship with the armed forces. Courts-martial were not to have concurrent jurisdiction with courts of law over non-military America.

On several occasions this Court has been faced with an attempted expansion of the jurisdiction of military courts. *Ex parte Milligan,* 4 Wall. 2, one of the great landmarks in this Court's history, held that military authorities were without power to try civilians not in the military or naval service by declaring martial law in an area where the civil

Convention of 1787, in Documents Illustrative of the Formation of The Union of The American States, H. R. Doc. No. 398, 69th Cong., 1st Sess. 564–571, 600–602; Warren, The Making of the Constitution (1947 ed.), 482–484, 517–521. The Federalist, Nos. 26, 27, 28, 41; Elliot's Debates (2d ed. 1836) *passim.*

administration was not deposed and the courts were not closed.[55]  In a stirring passage the Court proclaimed:

"Another guarantee of freedom was broken when Milligan was denied a trial by jury.  The great minds of the country have differed on the correct interpretation to be given to various provisions of the Federal Constitution; and judicial decision has been often invoked to settle their true meaning; but until recently no one ever doubted that the right of trial by jury was fortified in the organic law against the power of attack.  It is *now* assailed; but if ideas can be expressed in words, and language has any meaning, *this right*—one of the most valuable in a free country—is preserved to everyone accused of crime who is not attached to the army, or navy, or militia in actual service." [56]

In *Duncan* v. *Kahanamoku,* 327 U. S. 304, the Court reasserted the principles enunciated in *Ex parte Milligan* and reaffirmed the tradition of military subordination to civil authorities and institutions.  It refused to sanction the military trial of civilians in Hawaii during wartime despite government claims that the needs of defense made martial law imperative.

Just last Term, this Court held in *United States ex rel. Toth* v. *Quarles,* 350 U. S. 11, that military courts could not constitutionally try a discharged serviceman for an offense which he had allegedly committed while in the armed forces.  It was decided (1) that since Toth was a civilian he could not be tried by military court-martial,[57]

---

[55] Cf. *Ex parte Merryman,* 17 Fed. Cas. 144, No. 9,487.  And see the account of the trial of Theobald Wolfe Tone, 27 Howell's State Trials 614.

[56] 4 Wall., at 122–123.

[57] 350 U. S., at 22–23.  Cf. *United States ex rel. Flannery* v. *Commanding General,* 69 F. Supp. 661, rev'd by stipulation in unreported

and (2) that since he was charged with murder, a "crime" in the constitutional sense, he was entitled to indictment by a grand jury, jury trial, and the other protections contained in Art. III, § 2 and the Fifth, Sixth, and Eighth Amendments. The Court pointed out that trial by civilian courts was the rule for persons who were not members of the armed forces.

There are no supportable grounds upon which to distinguish the *Toth* case from the present cases. Toth, Mrs. Covert, and Mrs. Smith were all civilians. All three were American citizens. All three were tried for murder. All three alleged crimes were committed in a foreign country. The only differences were: (1) Toth was an ex-serviceman while they were wives of soldiers; (2) Toth was arrested in the United States while they were seized in foreign countries. If anything, Toth had closer connection with the military than the two women for his crime was committed while he was actually serving in the Air Force. Mrs. Covert and Mrs. Smith had never been members of the army, had never been employed by the army, had never served in the army in any capacity. The Government appropriately argued in *Toth* that the constitutional basis for court-martialing him was clearer than for court-martialing wives who are accompanying their husbands abroad.[58] Certainly Toth's conduct as a soldier bears a closer relation to the maintenance of order and discipline in the armed forces than the conduct of these wives. The fact that Toth was arrested here while the

order of the Second Circuit, No. 20235, April 18, 1946. And see *Ex parte Van Vranken,* 47 F. 888; *Antrim's Case,* 5 Phila. 278, 288; *Jones* v. *Seward,* 40 Barb. (N. Y.) 563, 569–570; *Smith* v. *Shaw,* 12 Johns. (N. Y.) 257.

[58] Brief for respondent, p. 31, *United States ex rel. Toth* v. *Quarles,* 350 U. S. 11: "Indeed, we think the constitutional case is, if anything, clearer for the court-martial of Toth, who was a soldier at the time of his offense, than it is for a civilian accompanying the armed forces."

wives were arrested in foreign countries is material only if constitutional safeguards do not shield a citizen abroad when the Government exercises its power over him. As we have said before, such a view of the Constitution is erroneous. The mere fact that these women had gone overseas with their husbands should not reduce the protection the Constitution gives them.

The *Milligan, Duncan* and *Toth* cases recognized and manifested the deeply rooted and ancient opposition in this country to the extension of military control over civilians. In each instance an effort to expand the jurisdiction of military courts to civilians was repulsed.

There have been a number of decisions in the lower federal courts which have upheld military trial of civilians performing services for the armed forces "in the field" during *time of war*.[59] To the extent that these cases can be justified, insofar as they involved trial of persons who were not "members" of the armed forces, they must rest on the Government's "war powers." In the face of an actively hostile enemy, military commanders necessarily have broad power over persons on the battlefront. From a time prior to the adoption of the Constitution the extraordinary circumstances present in an area of actual fighting have been considered sufficient to permit punishment of some civilians in that area by military courts under military rules.[60] But neither Japan

---

[59] *Perlstein* v. *United States,* 151 F. 2d 167, cert. granted, 327 U. S. 777, dismissed as moot, 328 U. S. 822; *Hines* v. *Mikell,* 259 F. 28; *Ex parte Jochen,* 257 F. 200; *Ex parte Falls,* 251 F. 415; *Ex parte Gerlach,* 247 F. 616; *Shilman* v. *United States,* 73 F. Supp. 648, reversed in part, 164 F. 2d 649, cert. denied, 333 U. S. 837; *In re Berue,* 54 F. Supp. 252; *McCune* v. *Kilpatrick,* 53 F. Supp. 80; *In re Di Bartolo,* 50 F. Supp. 929.

[60] See, *e. g.,* American Articles of War of 1775, Art. XXXII in Winthrop, Military Law and Precedents (2d ed., Reprint 1920), 953, 956.

We have examined all the cases of military trial of civilians by the

nor Great Britain could properly be said to be an area where active hostilities were under way at the time Mrs. Smith and Mrs. Covert committed their offenses or at the time they were tried.[61]

The Government urges that the concept "in the field" should be broadened to reach dependents accompanying the military forces overseas under the conditions of world tension which exist at the present time. It points out how the "war powers" include authority to prepare defenses and to establish our military forces in defensive posture about the world. While we recognize that the "war powers" of the Congress and the Executive are

---

British or American Armies prior to and contemporaneous with the Constitution that the Government has advanced or that we were able to find by independent research. Without exception these cases appear to have involved trials during wartime in the area of battle— "in the field"—or in occupied enemy territory. Even in these areas there are only isolated instances of military trial of "dependents" accompanying the armed forces. Apparently the normal method of disciplining camp followers was to expel them from the camp or to take away their ration privileges.

[61] Experts on military law, the Judge Advocate General and the Attorney General have repeatedly taken the position that "in the field" means in an area of actual fighting. See, *e. g.,* Winthrop, Military Law and Precedents (2d ed., Reprint 1920), 100–102; Davis, Military Law (3d ed. 1915), 478–479; Dudley, Military Law and the Procedures of Courts-Martial (2d ed. 1908), 413–414; 14 Op. Atty. Gen. 22; 16 *id.,* 48; Dig. Op. JAG (1912) 151; *id.* (1901) 56, 563; *id.* (1895) 76, 325–326, 599–600; *id.* (1880) 49, 211, 384. Cf. *Walker* v. *Chief Quarantine Officer,* 69 F. Supp. 980, 987.

Article 2 (10) of the UCMJ, 50 U. S. C. § 552 (10), provides that in *time of war* persons serving with or accompanying the armed forces in the field are subject to court-martial and military law. We believe that Art. 2 (10) sets forth the maximum historically recognized extent of military jurisdiction over civilians under the concept of "in the field." The Government does not attempt—and quite appropriately so—to support military jurisdiction over Mrs. Smith or Mrs. Covert under Art. 2 (10).

broad,[62] we reject the Government's argument that present threats to peace permit military trial of civilians accompanying the armed forces overseas in an area where no actual hostilities are under way.[63] The exigencies which have required military rule on the battlefront are not present in areas where no conflict exists. Military trial of civilians "in the field" is an extraordinary jurisdiction and it should not be expanded at the expense of the Bill of Rights. We agree with Colonel Winthrop, an expert on military jurisdiction, who declared: *"a statute cannot be framed by which a civilian can lawfully be made amenable to the military jurisdiction in time of peace."* [64] (Emphasis not supplied.)

As this Court stated in *United States ex rel. Toth* v. *Quarles,* 350 U. S. 11, the business of soldiers is to fight and prepare to fight wars, not to try civilians for their alleged crimes. Traditionally, military justice has been a rough form of justice emphasizing summary procedures,

---

[62] Even during time of war the Constitution must be observed. *Ex parte Milligan,* 4 Wall. 2, at 120, declares:

"The Constitution of the United States is a law for rulers and people, equally in war and in peace, and covers with the shield of its protection all classes of men, at all times, and under all circumstances. No doctrine, involving more pernicious consequences, was ever invented by the wit of man than that any of its provisions can be suspended during any of the great exigencies of government."

Also see *Hamilton* v. *Kentucky Distilleries Co.,* 251 U. S. 146, 156; *United States* v. *Commodities Trading Corp.,* 339 U. S. 121, 125.

[63] *Madsen* v. *Kinsella,* 343 U. S. 341, is not controlling here. It concerned trials in enemy territory which had been conquered and held by force of arms and which was being governed at the time by our military forces. In such areas the Army commander can establish military or civilian commissions as an arm of the occupation to try everyone in the occupied area, whether they are connected with the Army or not.

[64] Winthrop, Military Law and Precedents (2d ed., Reprint 1920), 107.

speedy convictions and stern penalties with a view to maintaining obedience and fighting fitness in the ranks. Because of its very nature and purpose the military must place great emphasis on discipline and efficiency. Correspondingly, there has always been less emphasis in the military on protecting the rights of the individual than in civilian society and in civilian courts.

Courts-martial are typically *ad hoc* bodies appointed by a military officer from among his subordinates. They have always been subject to varying degrees of "command influence." [65] In essence, these tribunals are simply executive tribunals whose personnel are in the executive chain of command. Frequently, the members of the court-martial must look to the appointing officer for promotions, advantageous assignments and efficiency ratings—in short, for their future progress in the service. Conceding to military personnel that high degree of honesty and sense of justice which nearly all of them undoubtedly have, the members of a court-martial, in the nature of things, do not and cannot have the independence of jurors drawn from the general public or of civilian judges.[66]

---

[65] See Hearings before a Subcommittee of the Senate Committee on Armed Services on S. 857 and H. R. 4080, 81st Cong., 1st Sess.; *Beets* v. *Hunter*, 75 F. Supp. 825, rev'd on other grounds, 180 F. 2d 101, cert. denied, 339 U. S. 963; *Shapiro* v. *United States*, 107 Ct. Cl. 650, 69 F. Supp. 205. Cf. Keeffe, JAG Justice in Korea, 6 Catholic U. of Amer. L. Rev. 1.

The officer who convenes the court-martial also has final authority to determine whether charges will be brought in the first place and to pick the board of inquiry, the prosecutor, the defense counsel, and the law officer who serves as legal adviser to the court-martial.

[66] Speaking of the imperative necessity that judges be independent, Hamilton declared:

". . . [L]iberty can have nothing to fear from the judiciary alone, but would have every thing to fear from its union with either of the other departments; . . . nothing can contribute so much to its firmness and independence as permanency in office, this quality

We recognize that a number of improvements have been made in military justice recently by engrafting more and more of the methods of civilian courts on courts-martial. In large part these ameliorations stem from the reaction of civilians, who were inducted during the two World Wars, to their experience with military justice. Notwithstanding the recent reforms, military trial does not give an accused the same protection which exists in the civil courts. Looming far above all other deficiencies of the military trial, of course, is the absence of trial by jury before an independent judge after an indictment by a grand jury. Moreover the reforms are merely statutory; Congress—and perhaps the President—can reinstate former practices, subject to any limitations imposed by the Constitution, whenever it desires.[67] As yet it has not been clearly settled to what extent the Bill of Rights and other protective parts of the Constitution apply to military trials.[68]

---

may therefore be justly regarded as an indispensable ingredient in its constitution, and, in a great measure, as the citadel of the public justice and the public security." The Federalist, No. 78.

[67] The chief legal officers of the armed services have already recommended to Congress that certain provisions of the UCMJ which were designed to provide protection to an accused should be repealed or limited in the interest of military order and efficiency. Joint Report of the United States Court of Military Appeals and the Judge Advocates General of the Armed Forces and the General Counsel of the Department of the Treasury (1954). See Walsh, Military Law: Return to Drumhead Justice?, 42 A. B. A. J. 521.

[68] Cf. *Burns* v. *Wilson*, 346 U. S. 137, 146, 148, 150; Note, 70 Harv. L. Rev. 1043, 1050-1053. But see *Jackson* v. *Taylor*, 353 U. S. 569; *In re Grimley*, 137 U. S. 147, 150. The exception in the Fifth Amendment, of course, provides that grand jury indictment is not required in cases subject to military trial and this exception has been read over into the Sixth Amendment so that the requirements of jury trial are inapplicable. *Ex parte Quirin*, 317 U. S. 1, 40. In *Swaim* v. *United States*, 165 U. S. 553, this Court held that the President or commanding officer had power to return a case to a court-martial for an

It must be emphasized that every person who comes within the jurisdiction of courts-martial is subject to military law—law that is substantially different from the law which governs civilian society. Military law is, in many respects, harsh law which is frequently cast in very sweeping and vague terms.[69] It emphasizes the iron hand of discipline more that it does the even scales of justice. Moreover, it has not yet been definitely established to what extent the President, as Commander-in-Chief of the armed forces, or his delegates, can promulgate, supplement or change substantive military law as well as the procedures of military courts in time of peace, or in time of war.[70] In any event, Congress has given the President broad discretion to provide the rules governing military trials.[71] For example, in these very cases a technical manual issued under the President's name with regard to the defense of insanity in military trials was of critical importance in the convictions of Mrs. Covert and Mrs. Smith. If the President can provide

---

increase in sentence. If the double jeopardy provisions of the Fifth Amendment were applicable such a practice would be unconstitutional. Cf. *Kepner* v. *United States*, 195 U. S. 100.

[69] For example, Art. 134, UCMJ, 50 U. S. C. § 728 provides:

"Though not specifically mentioned in this [Code], all disorders and neglects to the prejudice of good order and discipline in the armed forces, all conduct of a nature to bring discredit upon the armed forces . . . shall be taken cognizance of . . . and punished at the discretion of [a court-martial]."

In 1942 the Judge Advocate General ruled that a civilian employee of a contractor engaged in construction at an Army base could be tried by court-martial under the predecessor of Article 134 for advising his fellow employees to slow down at their work. Dig. Op. JAG, 1941 Supp., 357.

[70] See *Ex parte Quirin,* 317 U. S. 1, 28–29; *United States* v. *Eliason,* 16 Pet. 291, 301; *Swaim* v. *United States,* 165 U. S. 553. Cf. General Orders, No. 100, Official Records, War of Rebellion, Ser. III, Vol. III, April 24, 1863; 15 Op. Atty. Gen. 297 and Note attached.

[71] Art. 36, UCMJ, 50 U. S. C. § 611.

rules of substantive law as well as procedure, then he and his military subordinates exercise legislative, executive and judicial powers with respect to those subject to military trials. Such blending of functions in one branch of the Government is the objectionable thing which the draftsmen of the Constitution endeavored to prevent by providing for the separation of governmental powers.

In summary, "it still remains true that military tribunals have not been and probably never can be constituted in such way that they can have the same kind of qualifications that the Constitution has deemed essential to fair trials of civilians in federal courts." [72] In part this is attributable to the inherent differences in values and attitudes that separate the military establishment from civilian society. In the military, by necessity, emphasis must be placed on the security and order of the group rather than on the value and integrity of the individual.

It is urged that the expansion of military jurisdiction over civilians claimed here is only slight, and that the practical necessity for it is very great.[73] The attitude appears to be that a slight encroachment on the Bill of Rights and other safeguards in the Constitution need cause little concern. But to hold that these wives could be tried by the military would be a tempting precedent. Slight encroachments create new boundaries from which legions of power can seek new territory to capture. "It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional

[72] *United States ex rel. Toth* v. *Quarles,* 350 U. S. 11, 17.

[73] According to the Government's figures almost 95% of the civilians tried abroad by army courts-martial during the six-year period from 1949–1955 were tried for minor offenses. In this country "petty offenses" by civilians on military reservations are tried by civilian commissioners unless the alleged offender chooses trial in the Federal District Court. 18 U. S. C. § 3401.

practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon." [74] Moreover we cannot consider this encroachment a slight one. Throughout history many transgressions by the military have been called "slight" and have been justified as "reasonable" in light of the "uniqueness" of the times. We cannot close our eyes to the fact that today the peoples of many nations are ruled by the military.

We should not break faith with this Nation's tradition of keeping military power subservient to civilian authority, a tradition which we believe is firmly embodied in the Constitution. The country has remained true to that faith for almost one hundred seventy years. Perhaps no group in the Nation has been truer than military men themselves. Unlike the soldiers of many other nations, they have been content to perform their military duties in defense of the Nation in every period of need and to perform those duties well without attempting to usurp power which is not theirs under our system of constitutional government.

Ours is a government of divided authority on the assumption that in division there is not only strength but freedom from tyranny. And under our Constitution courts of law alone are given power to try civilians for

---

[74] *Boyd* v. *United States,* 116 U. S. 616, 635.

their offenses against the United States. The philosophy expressed by Lord Coke, speaking long ago from a wealth of experience, is still timely:

> "God send me never to live under the Law of Conveniency or Discretion. Shall the Souldier and Justice Sit on one Bench, the Trumpet will not let the Cryer speak in *Westminster-Hall*." [75]

In No. 701, *Reid* v. *Covert,* the judgment of the District Court directing that Mrs. Covert be released from custody is

*Affirmed.*

In No. 713, *Kinsella* v. *Krueger,* the judgment of the District Court is reversed and the case is remanded with instructions to order Mrs. Smith released from custody.

*Reversed and remanded.*

MR. JUSTICE WHITTAKER took no part in the consideration or decision of these cases.

MR. JUSTICE FRANKFURTER, concurring in the result.

These cases involve the constitutional power of Congress to provide for trial of civilian dependents accompanying members of the armed forces abroad by court-martial in capital cases. The normal method of trial of federal offenses under the Constitution is in a civilian tribunal. Trial of offenses by way of court-martial, with all the characteristics of its procedure so different from the forms and safeguards of procedure in the conventional courts, is an exercise of exceptional jurisdiction, arising from the power granted to Congress in Art. I, § 8, cl. 14, of the Constitution of the United States "To make Rules for the Government and Regula-

---

[75] 3 Rushworth, Historical Collections, App. 81.

tion of the land and naval Forces." *Dynes* v. *Hoover,* 20 How. 65; see *Toth* v. *Quarles,* 350 U. S. 11; Winthrop, Military Law and Precedents (2d ed. 1896), 52. Article 2 (11) of the Uniform Code of Military Justice, 64 Stat. 107, 109, 50 U. S. C. § 552 (11), and its predecessors were passed as an exercise of that power, and the agreements with England and Japan recognized that the jurisdiction to be exercised under those agreements was based on the relation of the persons involved to the military forces. See the agreement with Great Britain, 57 Stat. 1193, E. A. S. No. 355, and the United States of America (Visiting Forces) Act, 1942, 5 & 6 Geo. VI, c. 31; and the 1952 Administrative Agreement with Japan, 3 U. S. Treaties and Other International Agreements 3341, T. I. A. S. 2492.

Trial by court-martial is constitutionally permissible only for persons who can, on a fair appraisal, be regarded as falling within the authority given to Congress under Article I to regulate the "land and naval Forces," and who therefore are not protected by specific provisions of Article III and the Fifth and Sixth Amendments. It is of course true that, at least regarding the right to a grand jury indictment, the Fifth Amendment is not unmindful of the demands of military discipline.[1] Within the scope of appropriate construction, the phrase "except in cases arising in the land and naval Forces" has been assumed also to modify the guaranties of speedy and public trial

---

[1] "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces . . . ."

Article 2 of the Uniform Code of Military Justice provides: "The following persons are subject to this code: . . . (11) Subject to the provisions of any treaty or agreement to which the United States is or may be a party or to any accepted rule of international law, all persons serving with, employed by, or accompanying the armed forces without the continental limits of the United States . . . ."

by jury. And so, the problem before us is not to be answered by recourse to the literal words of this exception. The cases cannot be decided simply by saying that, since these women were not in uniform, they were not "in the land and naval Forces." The Court's function in constitutional adjudications is not exhausted by a literal reading of words. It may be tiresome, but it is nonetheless vital, to keep our judicial minds fixed on the injunction that "it is a *constitution* we are expounding." *M'Culloch* v. *Maryland,* 4 Wheat. 316, 407. Although Winthrop, in his treatise, states that the Constitution "clearly distinguishes the military from the civil class as separate communities" and "recognizes no third class which is part civil and part military—military for a particular purpose or in a particular situation, and civil for all other purposes and in all other situations . . . ," Winthrop, Military Law and Precedents (2d ed. 1896), 145, this Court, applying appropriate methods of constitutional interpretation, has long held, and in a variety of situations, that in the exercise of a power specifically granted to it, Congress may sweep in what may be necessary to make effective the explicitly worded power. See *Jacob Ruppert* v. *Caffey,* 251 U. S. 264, especially 289 *et seq.; Purity Extract Co.* v. *Lynch,* 226 U. S. 192, 201; *Railroad Commission* v. *Chicago, Burlington & Quincy R. Co.,* 257 U. S. 563, 588. This is the significance of the Necessary and Proper Clause, which is not to be considered so much a separate clause in Art. I, § 8, as an integral part of each of the preceding 17 clauses. Only thus may be avoided a strangling literalness in construing a document that is not an enumeration of static rules but the living framework of government designed for an undefined future. *M'Culloch* v. *Maryland,* 4 Wheat. 316; *Hurtado* v. *California,* 110 U. S. 516, 530–531.

Everything that may be deemed, as the exercise of an allowable judgment by Congress, to fall fairly within the

conception conveyed by the power given to Congress "To make Rules for the Government and Regulation of the land and naval Forces" is constitutionally within that legislative grant and not subject to revision by the independent judgment of the Court. To be sure, every event or transaction that bears some relation to "the land and naval Forces" does not *ipso facto* come within the tolerant conception of that legislative grant. The issue in these cases involves regard for considerations not dissimilar to those involved in a determination under the Due Process Clause. Obviously, the practical situations before us bear some relation to the military. Yet the question for this Court is not merely whether the relation of these women to the "land and naval Forces" is sufficiently close to preclude the necessity of finding that Congress has been arbitrary in its selection of a particular method of trial. For, although we must look to Art. I, § 8, cl. 14, as the immediate justifying power, it is not the only clause of the Constitution to be taken into account. The Constitution is an organic scheme of government to be dealt with as an entirety. A particular provision cannot be dissevered from the rest of the Constitution. Our conclusion in these cases therefore must take due account of Article III and the Fifth and Sixth Amendments. We must weigh all the factors involved in these cases in order to decide whether these women dependents are so closely related to what Congress may allowably deem essential for the effective "Government and Regulation of the land and naval Forces" that they may be subjected to court-martial jurisdiction in these capital cases, when the consequence is loss of the protections afforded by Article III and the Fifth and Sixth Amendments.

We are not concerned here even with the possibility of some alternative non-military type of trial that does

not contain all the safeguards of Article III and the Fifth and Sixth Amendments. We must judge only what has been enacted and what is at issue. It is the power actually asserted by Congress under Art. I, § 8, cl. 14, that must now be adjudged in the light of Article III and the Fifth and Sixth Amendments. In making this adjudication, I must emphasize that it is only the trial of civilian dependents in a capital case in time of peace that is in question. The Court has not before it, and therefore I need not intimate any opinion on, situations involving civilians, in the sense of persons not having a military status, other than dependents. Nor do we have before us a case involving a non-capital crime. This narrow delineation of the issue is merely to respect the important restrictions binding on the Court when passing on the constitutionality of an Act of Congress. "In the exercise of that jurisdiction, it is bound by two rules, to which it has rigidly adhered, one, never to anticipate a question of constitutional law in advance of the necessity of deciding it; the other never to formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied. These rules are safe guides to sound judgment. It is the dictate of wisdom to follow them closely and carefully." *Steamship Co.* v. *Emigration Commissioners,* 113 U. S. 33, 39.

We are also not concerned here with the substantive aspects of the grant of power to Congress to "make Rules for the Government and Regulation of the land and naval Forces." What conduct should be punished and what constitutes a capital case are matters for congressional discretion, always subject of course to any specific restrictions of the Constitution. These cases involve the validity of procedural conditions for determining the commission of a crime in fact punishable by death. The taking of life is irrevocable. It is in capital cases especially

that the balance of conflicting interests must be weighted most heavily in favor of the procedural safeguards of the Bill of Rights. Thus, in *Powell* v. *Alabama,* 287 U. S. 45, 71, the fact "above all that they stood in deadly peril of their lives" led the Court to conclude that the defendants had been denied due process by the failure to allow them reasonable time to seek counsel and the failure to appoint counsel. I repeat. I do not mean to imply that the considerations that are controlling in capital cases involving civilian dependents are constitutionally irrelevant in capital cases involving civilians other than dependents or in non-capital cases involving dependents or other civilians. I do say that we are dealing here only with capital cases and civilian dependents.

The Government asserts that civilian dependents are an integral part of our armed forces overseas and that there is substantial military necessity for subjecting them to court-martial jurisdiction. The Government points out that civilian dependents go abroad under military auspices, live with military personnel in a military community, enjoy the privileges of military facilities, and that their conduct inevitably tends to influence military discipline.

The prosecution by court-martial for capital crimes committed by civilian dependents of members of the armed forces abroad is hardly to be deemed, under modern conditions, obviously appropriate to the effective exercise of the power to "make Rules for the Government and Regulation of the land and naval Forces" when it is a question of deciding what power is granted under Article I and therefore what restriction is made on Article III and the Fifth and Sixth Amendments. I do not think that the proximity, physical and social, of these women to the "land and naval Forces" is, with due regard to all that has been put before us, so clearly demanded by the effective "Government and Regulation"

of those forces as reasonably to demonstrate a justification for court-martial jurisdiction over capital offenses.

The Government speaks of the "great potential impact on military discipline" of these accompanying civilian dependents. This cannot be denied, nor should its implications be minimized. But the notion that discipline over military personnel is to be furthered by subjecting their civilian dependents to the threat of capital punishment imposed by court-martial is too hostile to the reasons that underlie the procedural safeguards of the Bill of Rights for those safeguards to be displaced. It is true that military discipline might be affected seriously if civilian dependents could commit murders and other capital crimes with impunity. No one, however, challenges the availability to Congress of a power to provide for trial and punishment of these dependents for such crimes.[2] The method of trial alone is in issue. The Government suggests that, if trial in an Article III court subject to the restrictions of the Fifth and Sixth Amendments is the only alternative, such a trial could not be held abroad practicably, and it would often be equally impracticable to transport all the witnesses back to the United States for trial. But, although there is no need to pass on that issue in this case, trial in the United States is obviously not the only practical alternative and other alternatives may raise different constitutional questions. The Government's own figures for the Army show that the total number of civilians (all civilians "serving with, employed by, or accompanying the armed forces" overseas and not merely civilian dependents) for whom general courts-martial for alleged

---

[2] Article III, § 2, cl. 3, provides that "The Trial of all Crimes . . . when not committed within any State . . . shall be at such Place or Places as the Congress may by Law have directed." Since 1790, 1 Stat. 113–114, Congress has provided for such trial in the district where the offender is found (apprehended) or first brought. See 18 U. S. C. § 3238.

murder were deemed advisable [3] was only 13 in the 7
fiscal years, 1950–1956. It is impossible to ascertain from
the figures supplied to us exactly how many persons were
tried for other capital offenses, but the figures indicate
that there could not have been many. There is nothing
to indicate that the figures for the other services are more
substantial. It thus appears to be a manageable problem
within the procedural restrictions found necessary by this
opinion.

A further argument is made that a decision adverse to
the Government would mean that only a foreign trial
could be had. Even assuming that the NATO Status of
Forces Agreement, 4 U. S. Treaties and Other Interna-
tional Agreements 1792, T. I. A. S. 2846, covering
countries where a large part of our armed forces are
stationed, gives jurisdiction to the United States only
through its military authorities, this Court cannot specu-
late that any given nation would be unwilling to grant or
continue such extraterritorial jurisdiction over civilian
dependents in capital cases if they were to be tried by
some other manner than court-martial. And, even if
such were the case, these civilian dependents would then

---

[3] Under Article 19 of the Uniform Code of Military Justice, 64
Stat. 114, 50 U. S. C. § 579, a special court-martial may impose any
punishment not forbidden by the Code "except death, dishonorable
discharge, dismissal, confinement in excess of six months, hard labor
without confinement in excess of three months, forfeiture of pay
exceeding two-thirds pay per month, or forfeiture of pay for a period
exceeding six months." Under Art. 20, 64 Stat. 114, 50 U. S. C.
§ 580, a summary court-martial may impose any punishment not
forbidden by the Code "except death, dismissal, dishonorable or bad-
conduct discharge, confinement in excess of one month, hard labor
without confinement in excess of forty-five days, restriction to certain
specified limits in excess of two months, or forfeiture of pay in excess
of two-thirds of one month's pay." In order to impose a punish-
ment in excess of these limits, a general court-martial must be
convened under Art. 18, 64 Stat. 114, 50 U. S. C. § 578.

merely be in the same position as are so many federal employees and their dependents and other United States citizens who are subject to the laws of foreign nations when residing there.[4] See also the NATO Status of Forces Agreement, *supra,* Art. VII, §§ 2, 3.

The Government makes the final argument that these civilian dependents are part of the United States military contingent abroad in the eyes of the foreign nations concerned and that their conduct may have a profound effect on our relations with these countries, with a consequent effect on the military establishment there. But the argument that military court-martials in capital cases are necessitated by this factor assumes either that a military court-martial constitutes a stronger deterrent to this sort of conduct or that, in the absence of such a trial, no punishment would be meted out and our foreign policy thereby injured. The reasons why these considerations carry no conviction have already been indicated.

I therefore conclude that, in capital cases, the exercise of court-martial jurisdiction over civilian dependents in time of peace cannot be justified by Article I, considered in connection with the specific protections of Article III and the Fifth and Sixth Amendments.

Since the conclusion thus reached differs from what the Court decided last Term, a decent respect for the judicial process calls for re-examination of the two grounds that then prevailed. The Court sustained its action on the

---

[4] A Report of the Joint Committee on Reduction of Nonessential Federal Expenditures on Federal Personnel and Pay indicates that the executive agencies of the Federal Government, excluding the Department of Defense, alone employed 51,027 persons outside the continental United States in February 1957, excluding employees of the Panama Canal. S. Com. Print No. 157, 85th Cong., 1st Sess. Although these figures include "some foreign nationals," they nevertheless indicate a substantial number of United States citizens subject to foreign law. See 103 Cong. Rec. 5313–5316.

authority of the cases dealing with the power of Congress to "make all needful Rules and Regulations" for the Territories, reinforced by *In re Ross,* 140 U. S. 453, in which this Court, in 1891, sustained the criminal jurisdiction of a consular court in Japan.[5] These authorities grew out of, and related to, specific situations very different from those now here. They do not control or even embarrass the problem before us.

Legal doctrines are not self-generated abstract categories. They do not fall from the sky; nor are they pulled out of it. They have a specific juridical origin and etiology. They derive meaning and content from the circumstances that gave rise to them and from the purposes they were designed to serve. To these they are bound as is a live tree to its roots. Doctrines like those expressed by the *Ross* case and the series of cases beginning with *American Insurance Co.* v. *Canter,* 1 Pet. 511, must be placed in their historical setting. They cannot be wrenched from it and mechanically transplanted into an alien, unrelated context without suffering mutilation or distortion. "If a precedent involving a black horse is applied to a case involving a white horse, we are not excited. If it were an elephant or an animal *ferae naturae* or a chose in action, then we would venture into thought. The difference might make a difference. We really are concerned about precedents chiefly when their facts differ somewhat from the facts in the case at bar. Then there is a gulf or hiatus that has to be bridged by a concern for principle and a concern for practical results and practical wisdom." Thomas Reed Powell, Vagaries and Varieties in Constitutional Interpretation,

---

[5] Having based the constitutionality of Article 2 (11) on these grounds, the Court concluded, "we have no need to examine the power of Congress 'To make Rules for the Government and Regulation of the land and naval Forces' under Article I of the Constitution." 351 U. S. 470, 476.

36.  This attitude toward precedent underlies the whole system of our case law.  It was thus summarized by Mr. Justice Brandeis: "It is a peculiar virtue of our system of law that the process of inclusion and exclusion, so often employed in developing a rule, is not allowed to end with its enunciation and that an expression in an opinion yields later to the impact of facts unforeseen." *Jaybird Mining Co.* v. *Weir,* 271 U. S. 609, 619 (dissenting). Especially is this attitude to be observed in constitutional controversies.

The territorial cases relied on by the Court last Term held that certain specific constitutional restrictions on the Government did not automatically apply in the acquired territories of Florida, Hawaii, the Philippines, or Puerto Rico.  In these cases, the Court drew its decisions from the power of Congress to "make all needful Rules and Regulations respecting the Territory . . . belonging to the United States," for which provision is made in Art. IV, § 3.  The United States from time to time acquired lands in which many of our laws and customs found an uncongenial soil because they ill 'accorded with the history and habits of their people.  Mindful of all relevant provisions of the Constitution and not allowing one to frustrate another—which is the guiding thought of this opinion—the Court found it necessary to read Art. IV, § 3, together with the Fifth and Sixth Amendments and Article III in the light of those circumstances.  The question arose most frequently with respect to the establishment of trial by jury in possessions in which such a system was wholly without antecedents.  The Court consistently held with respect to such "Territory" that congressional power under Art. IV, § 3, was not restricted by the requirement of Art. III, § 2, cl. 3, and the Sixth Amendment of providing trial by jury.

"If the right to trial by jury were a fundamental right which goes wherever the jurisdiction of the

United States extends, or if Congress, in framing laws for outlying territory belonging to the United States, was obliged to establish that system by affirmative legislation, it would follow that, no matter what the needs or capacities of the people, trial by jury, and in no other way, must be forthwith established, although the result may be to work injustice and provoke disturbance rather than to aid the orderly administration of justice. If the United States, impelled by its duty or advantage, shall acquire territory peopled by savages, and of which it may dispose or not hold for ultimate admission to Statehood, if this doctrine is sound, it must establish there the trial by jury. To state such a proposition demonstrates the impossibility of carrying it into practice. Again, if the United States shall acquire by treaty the cession of territory having an established system of jurisprudence, where jury trials are unknown, but a method of fair and orderly trial prevails under an acceptable and long-established code, the preference of the people must be disregarded, their established customs ignored and they themselves coerced to accept, in advance of incorporation into the United States, a system of trial unknown to them and unsuited to their needs. We do not think it was intended, in giving power to Congress to make regulations for the territories, to hamper its exercise with this condition." *Dorr* v. *United States,* 195 U. S. 138, 148.[6]

---

[6] In *Hawaii* v. *Mankichi,* 190 U. S. 197, the Court rested its decision on an interpretation of the joint resolution of Congress annexing the Hawaiian Islands. The Court held that the act of annexation did not of its own force require indictment by grand jury and a trial by a Sixth Amendment jury. Implicit in this holding was the assumption that such indictment and trial were not constitutionally required in Hawaii. This assumption was based on a recognition

The "fundamental right" test is the one which the Court has consistently enunciated in the long series of cases— e. g., *American Ins. Co.* v. *Canter,* 1 Pet. 511; *De Lima* v. *Bidwell,* 182 U. S. 1; *Downes* v. *Bidwell,* 182 U. S. 244; *Dorr* v. *United States,* 195 U. S. 138, *Balzac* v. *Porto Rico,* 258 U. S. 298—dealing with claims of constitutional restrictions on the power of Congress to "make all needful Rules and Regulations" for governing the unincorporated territories. The process of decision appropriate to the problem led to a detailed examination of the relation of the specific "Territory" to the United States. This examination, in its similarity to analysis in terms of "due process," is essentially the same as that to be made in the present cases in weighing congressional power to make "Rules for the Government and Regulation of the land and naval Forces" against the safeguards of Article III and the Fifth and Sixth Amendments.

The results in the cases that arose by reason of the acquisition of exotic "Territory" do not control the present cases, for the territorial cases rest specifically on Art. IV, § 3, which is a grant of power to Congress to deal with "Territory" and other Government property. Of course the power sought to be exercised in Great Britain and Japan does not relate to "Territory." [7] The Court's

---

that the act should not be construed as "imposing upon the islands every provision of a Constitution, which must have been unfamiliar to a large number of their inhabitants, and for which no previous preparation had been made . . . ." *Id.,* at 215–216.

[7] For a statement of the applicable law before the question arose with respect to lands outside the continental limits of the United States, see *Thompson* v. *Utah,* 170 U. S. 343, 347: "It is equally beyond question that the provisions of the National Constitution relating to trials by jury for crimes and to criminal prosecutions apply to the Territories of the United States." But see *Mormon Church* v. *United States,* 136 U. S. 1, 44: "Doubtless Congress, in legislating for the Territories would be subject to those fundamental limitations in favor of personal rights which are formulated in the

opinions in the territorial cases did not lay down a broad principle that the protective provisions of the Constitution do not apply outside the continental limits of the United States. This Court considered the particular situation in each newly acquired territory to determine whether the grant to Congress of power to govern "Territory" was restricted by a specific provision of the Constitution. The territorial cases, in the emphasis put by them on the necessity for considering the specific circumstances of each particular case, are thus relevant in that they provide an illustrative method for harmonizing constitutional provisions which appear, separately considered, to be conflicting.

The Court last Term relied on a second source of authority, the consular court case, *In re Ross,* 140 U. S. 453. Pursuant to a treaty with Japan, Ross, a British subject but a member of the crew of a United States ship, was tried and convicted in a consular court in Yokohama for murder of a fellow seaman while the ship was in Yokohama harbor. His application for a writ of habeas corpus to a United States Circuit Court was denied, 44 F. 185, and on appeal here, the judgment was affirmed. This Court set forth the ground of the Circuit Court, "the long and uniform acquiescence by the executive, administrative and legislative departments of the government in the validity of the legislation," 140 U. S., at 461, and then stated:

> "The Circuit Court might have found an additional ground for not calling in question the legislation of Congress, in the uniform practice of civilized governments for centuries to provide consular tribunals in other than Christian countries . . . for the

---

Constitution and its amendments; but these limitations would exist rather by inference and the general spirit of the Constitution from which Congress derives all its powers, than by any express and direct application of its provisions."

trial of their own subjects or citizens for offences committed in those countries, as well as for the settlement of civil disputes between them; and in the uniform recognition, down to the time of the formation of our government, of the fact that the establishment of such tribunals was among the most important subjects for treaty stipulations. . . .

.  .  .  .  .

"The treaty-making power vested in our government extends to all proper subjects of negotiation with foreign governments. It can, equally with any of the former or present governments of Europe, make treaties providing for the exercise of judicial authority in other countries by its officers appointed to reside therein.

"We do not understand that any question is made by counsel as to its power in this respect. His objection is to the legislation by which such treaties are carried out . . . .

". . . By the Constitution a government is ordained and established 'for the United States of America,' and not for countries outside of their limits. The guarantees it affords against accusation of capital or infamous crimes, except by indictment or presentment by a grand jury, and for an impartial trial by a jury when thus accused, apply only to citizens and others within the United States, or who are brought there for trial for alleged offences committed elsewhere, and not to residents or temporary sojourners abroad. . . . The Constitution can have no operation in another country. When, therefore, the representatives or officers of our government are permitted to exercise authority of any kind in another country, it must be on such conditions as the two countries may agree, the laws of neither one being obligatory upon the other. The deck of a private

> American vessel, it is true, is considered for many
> purposes constructively as territory of the United
> States, yet persons on board of such vessels, whether
> officers, sailors, or passengers, cannot invoke the pro-
> tection of the provisions referred to until brought
> within the actual territorial boundaries of the United
> States. . . ." 140 U. S., at 462–464.

One observation should be made at the outset about
the grounds for decision in *Ross*. Insofar as the opinion
expressed a view that the Constitution is not operative
outside the United States—and apparently Mr. Justice
Field meant by "United States" all lands over which the
United States flag flew, see John W. Burgess, How May
the United States Govern Its Extra-Continental Terri-
tory?, 14 Pol. Sci. Q. 1 (1899)—it expressed a notion that
has long since evaporated. Governmental action abroad
is performed under both the authority and the restrictions
of the Constitution—for example, proceedings before
American military tribunals, whether in Great Britain or
in the United States, are subject to the applicable restric-
tions of the Constitution. See opinions in *Burns* v.
*Wilson,* 346 U. S. 137.

The significance of the *Ross* case and its relevance to
the present cases cannot be assessed unless due regard
is accorded the historical context in which that case was
decided. *Ross* is not rooted in any abstract principle or
comprehensive theory touching constitutional power or
its restrictions. It was decided with reference to a very
particular, practical problem with a long history. To be
mindful of this does not attribute to Mr. Justice Field's
opinion some unavowed historical assumption. On
behalf of the whole Court, he spelled out the considera-
tions that controlled it:

> "The practice of European governments to send
> officers to reside in foreign countries, authorized to

exercise a limited jurisdiction over vessels and seamen of their country, to watch the interests of their countrymen and to assist in adjusting their disputes and protecting their commerce, goes back to a very early period, even preceding what are termed the Middle Ages. . . . In other than Christian countries they were, by treaty stipulations, usually clothed with authority to hear complaints against their countrymen and to sit in judgment upon them when charged with public offences. After the rise of Islamism, and the spread of its followers over eastern Asia and other countries bordering on the Mediterranean, the exercise of this judicial authority became a matter of great concern. The intense hostility of the people of Moslem faith to all other sects, and particularly to Christians, affected all their intercourse, and all proceedings had in their tribunals. Even the rules of evidence adopted by them placed those of different faith on unequal grounds in any controversy with them. For this cause, and by reason of the barbarous and cruel punishments inflicted in those countries, and the frequent use of torture to enforce confession from parties accused, it was a matter of deep interest to Christian governments to withdraw the trial of their subjects, when charged with the commission of a public offence, from the arbitrary and despotic action of the local officials. Treaties conferring such jurisdiction upon these consuls were essential to the peaceful residence of Christians within those countries and the successful prosecution of commerce with their people." 140 U. S., at 462–463.

"It is true that the occasion for consular tribunals in Japan may hereafter be less than at present, as every year that country progresses in civilization and in the assimilation of its system of judicial pro-

58

cedure to that of Christian countries, as well as in the improvement of its penal statutes; but the system of consular tribunals . . . is of the highest importance, and their establishment in other than Christian countries, where our people may desire to go in pursuit of commerce, will often be essential for the protection of their persons and property." *Id.*, at 480.[8]

It is important to have a lively sense of this background before attempting to draw on the *Ross* case. Historians have traced grants of extraterritorial rights as far back as the permission given by Egypt in the 12th or 13th century B. C. to the merchants of Tyre to establish factories on the Nile and to live under their own law and practice their own religion. Numerous other instances of persons living under their own law in foreign lands existed in the later pre-Christian era and during the Roman Empire and the so-called Dark and Middle Ages—Greeks in

---

[8] This feeling about the "non-Christian" nations of the world was widely shared. In his "Jubilee of the Constitution," delivered on the 50th anniversary of the inauguration of George Washington, John Quincy Adams said:

"The Declaration of Independence recognised the European law of nations, as practised among Christian nations, to be that by which they considered themselves bound, and of which they claimed the rights. This system is founded upon the principle, that the state of nature between men and between nations, is a state of peace. But there was a Mahometan law of nations, which considered the state of nature as a state of war—an Asiatic law of nations, which excluded all foreigners from admission within the territories of the state . . . . With all these different communities, the relations of the United States were from the time when they had become an independent nation, variously modified according to the operation of those various laws. It was the purpose of the Constitution of the United States to *establish justice* over them all." Adams, Jubilee of the Constitution, 73. See also the views of Secretary of State Hamilton Fish, quoted in 351 U. S., at 484–485.

Egypt, all sorts of foreigners in Rome, inhabitants of Christian cities and states in the Byzantine Empire, the Latin kingdoms of the Levant, and other Christian cities and states, Mohammedans in the Byzantine Empire and China, and many others lived in foreign lands under their own law. While the origins of this extraterritorial jurisdiction may have differed in each country, the notion that law was for the benefit of the citizens of a country and its advantages not for foreigners appears to have been an important factor. Thus, there existed a long-established custom of extraterritorial jurisdiction at the beginning of the 15th century when the complete conquest of the Byzantine Empire by the Turks and the establishment of the Ottoman Empire substantially altered political relations between Christian Europe and the Near East. But commercial relations continued, and in 1535 Francis I of France negotiated a treaty with Suleiman I of Turkey that provided for numerous extraterritorial rights, including criminal and civil jurisdiction over all disputes among French subjects. 1 Ernest Charrière, Négociations de la France dans le Levant 283. Other nations and eventually the United States in 1830, 8 Stat. 408, later negotiated similar treaties with the Turks. (For a more complete history of the development of extraterritorial rights and consular jurisdiction see 1 Calvo, Le Droit International Théorique et Pratique (5th ed., Rousseau, 1896), 2–18, 2 id., 9–12; Hinckley, American Consular Jurisdiction in the Orient, 1–9; 1 Miltitz, Manuel des Consuls passim; Ravndal, The Origin of the Capitulations and of the Consular Institution, S. Doc. No. 34, 67th Cong., 1st Sess. 5–45, 56–96; Shih Shun Liu, Extraterritoriality, 23–66, 118 Studies in History, Economics and Public Law, Columbia University (1925); Twiss, The Law of Nations (Rev. ed. 1884), 443–457.)

The emergence of the nation-state in Europe and the growth of the doctrine of absolute territorial sovereignty changed the nature of extraterritorial rights. No longer were strangers to be denied the advantages of local law. Indeed, territorial sovereignty meant the exercise of sovereignty over all residents within the borders of the state, and the system of extraterritorial consular jurisdiction tended to die out among Christian nations in the 18th and 19th centuries. But a new justification was found for the continuation of that jurisdiction in those countries whose systems of justice were considered inferior, and it was this strong feeling with respect to Moslem and Far Eastern countries that was reflected, as we have seen, in the *Ross* opinion.

Until 1842, China had asserted control over all foreigners within its territory, Shih Shun Liu, *op. cit. supra,* 76–89, but, as a result of the Opium War, Great Britain negotiated a treaty with China whereby she obtained consular offices in five open ports and was granted extraterritorial rights over her citizens. On July 3, 1844, Caleb Cushing negotiated a similar treaty on behalf of the United States. 8 Stat. 592. In a letter to Secretary of State Calhoun, he explained: "I entered China with the formed *general* conviction that the United States ought not to concede to any foreign state, under any circumstances, jurisdiction over the life and liberty of a citizen of the United States, unless that foreign state be of our own family of nations,—in a word, a Christian state." Quoted in 7 Op. Atty. Gen. 495, 496–497. Later treaties continued the extraterritorial rights of the United States, and the Treaty of 1903 contained the following article demonstrating the purpose of those rights:

"The Government of China having expressed a strong desire to reform its judicial system and to bring it into accord with that of Western nations, the

United States agrees to give every assistance to such reform and will also be prepared to relinquish extraterritorial rights when satisfied that the state of the Chinese laws, the arrangements for their administration, and other considerations warrant it in doing so." 33 Stat. 2208, 2215.

The first treaty with Japan was negotiated by Commodore Perry in 1854. 11 Stat. 597. It opened two ports, but did not provide for any exercise of judicial powers by United States officials. Under the Treaty of 1857, 11 Stat. 723, such power was given, and later treaties, which opened up further Japanese cities for trade and residence by United States citizens, retained these rights. The treaty of 1894, effective on July 17, 1899, however, ended these extraterritorial rights and Japan, even though a "non-Christian" nation, came to occupy the same status as Christian nations. 29 Stat. 848. The exercise of criminal jurisdiction by consuls over United States citizens was also provided for, at one time or another, in treaties with Borneo, 10 Stat. 909, 910; Siam, 11 Stat. 683, 684; Madagascar, 15 Stat. 491, 492; Samoan Islands, 20 Stat. 704; Korea, 23 Stat. 720, 721; Tonga Islands, 25 Stat. 1440, 1442, and, by virtue of most-favored-nation clauses, in treaties with Tripoli, 8 Stat. 154; Persia, 11 Stat. 709; the Congo, 27 Stat. 926; and Ethiopia, 33 Stat. 2254. The exercise of criminal jurisdiction was also provided for in a treaty with Morocco, 8 Stat. 100, by virtue of a most-favored-nation clause and by virtue of a clause granting jurisdiction if "any . . . citizens of the United States . . . shall have any disputes with each other." The word "disputes" has been interpreted by the International Court of Justice to comprehend criminal as well as civil disputes. *France* v. *United States,* I. C. J. Reports 1952, pp. 176, 188–189. The treaties with Algiers, 8 Stat. 133, 224, 244; Tunis, 8 Stat.

157; and Muscat, 8 Stat. 458, contained similar "disputes" clauses.[9]

The judicial power exercised by consuls was defined by statute and was sweeping:

> "Jurisdiction in both criminal and civil matters shall, in all cases, be exercised and enforced in conformity with the laws of the United States, which are hereby, so far as is necessary to execute such treaties, respectively, and so far as they are suitable to carry the same into effect, extended over all citizens of the United States in those countries, and over all others to the extent that the terms of the treaties, respectively, justify or require. But in all cases where such laws are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies, the common law and the law of equity and admiralty shall be extended in like manner over such citizens and others in those countries; and if neither the common law, nor the law of equity or admiralty, nor the statutes of the United States, furnish appropriate and sufficient remedies, the ministers in those countries, respectively, shall, by decrees and regulations which shall have the force of law, supply such defects and deficiencies." Rev. Stat. § 4086.

The consuls, then, exercised not only executive and judicial power, but legislative power as well.

The number of people subject to the jurisdiction of these courts during their most active periods appears to

---

[9] On August 1, 1956, the President approved Public Law 856, 84th Cong., 2d Sess., providing for the relinquishment by the President, at such time as he deemed appropriate, of the consular jurisdiction of the United States in Morocco, the only foreign country where United States consuls continued to exercise such jurisdiction. 70 Stat. 773. The jurisdiction was relinquished on October 6, 1956. N. Y. Times, Oct. 8, 1956, p. 1, col. 6.

have been fairly small. In the Chronicle & Directory for China, Japan, & the Philippines, for the year 1870, there is a listing of the total number of foreign, not just United States, residents in these three places. The list is 81 pages long, with a total of some 4,500 persons. (Pp. 54–134.) This same publication gives the following information about Japan: "The number of foreigners settled in Japan is as yet very small. At the end of the year 1862, the foreign community at Kanagawa, the principal of the three ports of Japan open to aliens, consisted of . . . thirty-eight Americans . . . and in the latter part of 1864 the permanent foreign residents at Kanagawa had increased to 300, not counting soldiers, of which number . . . about 80 [were] Americans . . . . At Nagasaki, the second port of Japan thrown open to foreign trade by the government, the number of alien settlers was as follows on the 1st of January, 1866:— . . . American citizens 32 . . . . A third port opened to European and American traders, that of Hakodadi, in the north of Japan, was deserted, after a lengthened trial, by nearly all the foreign merchants settled there . . . ." (Appendix, p. 353.) The Statesman's Yearbook of 1890 shows: China at the end of 1888: 1,020 Americans (p. 411); Japan in 1887: 711 Americans (p. 709); Morocco, 1889 estimate: "The number of Christians is very small, not exceeding 1,500." (P. 739.) The Statesman's Yearbook of 1901 shows: China at the end of 1899: 2,335 Americans (p. 484); Japan, December 31, 1898, just before the termination of our extraterritorial rights: 1,165 Americans (p. 809); Morocco: "The number of Christians does not exceed 6,000; the Christian population of Tangier alone probably amounts to 5,000." (P. 851.) These figures of course do not include those civilians temporarily in the country coming within consular jurisdiction.

64

The consular court jurisdiction, then, was exercised in countries whose legal systems at the time were considered so inferior that justice could not be obtained in them by our citizens. The existence of these courts was based on long-established custom and they were justified as the best possible means for securing justice for the few Americans present in those countries. The *Ross* case, therefore, arose out of, and rests on, very special, confined circumstances, and cannot be applied automatically to the present situation, involving hundreds of thousands of American citizens in countries with civilized systems of justice. If Congress had established consular courts or some other non-military procedure for trial that did not contain all the protections afforded by Article III and the Fifth and Sixth Amendments for the trial of civilian dependents of military personnel abroad, we would be forced to a detailed analysis of the situation of the civilian dependent population abroad in deciding whether the *Ross* case should be extended to cover such a case. It is not necessary to do this in the present cases in view of our decision that the form of trial here provided cannot constitutionally be justified.

The Government, apparently recognizing the constitutional basis for the decision in *Ross,* has, on rehearing, sought to show that civilians in general and civilian dependents in particular have been subject to military order and discipline ever since the colonial period. The materials it has submitted seem too episodic, too meager, to form a solid basis in history, preceding and contemporaneous with the framing of the Constitution, for constitutional adjudication. What has been urged on us falls far too short of proving a well-established practice—to be deemed to be infused into the Constitution—of courtmartial jurisdiction, certainly not in capital cases, over such civilians in time of peace.

Mr. Justice Harlan, concurring in the result.

I concur in the result, on the narrow ground that where the offense is capital, Article 2 (11)[1] cannot constitutionally be applied to the trial of civilian dependents of members of the armed forces overseas in times of peace.

Since I am the only one among today's majority who joined in the Court's opinions of June 11, 1956, which sustained the court-martial jurisdiction in these cases, 351 U. S. 470, 487, I think it appropriate to state the reasons which led to my voting, first, to rehear these cases, 352 U. S. 901, and, now, to strike down that jurisdiction.

## I.

The petitions for rehearing which were filed last summer afforded an opportunity for a greater degree of reflection upon the difficult issues involved in these cases than, at least for me, was possible in the short interval between the argument and decision of the cases in the closing days of last Term.[2]   As a result I became satisfied that this court-martial jurisdiction could in any event not be sustained upon the reasoning of our prior opinion. In essence, that reasoning was this: (1) Under *In re Ross,* 140 U. S. 453, and the *Insular Cases,*[3] the requirement of a trial by an Article III court and the other specific safeguards of Article III and the Fifth and Sixth Amendments are not applicable to the trial of American citizens outside the United States; (2) there is thus no express constitutional prohibition against the use of courts-

---

[1] 50 U. S. C. § 552 (11).

[2] The cases were argued on May 3, 1956, and decided on June 11, 1956.

[3] *Downes* v. *Bidwell,* 182 U. S. 244; *Hawaii* v. *Mankichi,* 190 U. S. 197; *Dorr* v. *United States,* 195 U. S. 138; *Balzac* v. *Porto Rico,* 258 U. S. 298.

martial for such trials abroad; (3) the choice of a court-martial in cases such as these was "reasonable," because of these women's connection with the military, and therefore satisfied due process; (4) the court-martial jurisdiction was thus constitutional. I have since concluded that this analysis was not sound, for two reasons:

(1) The underlying premise of the prior opinion, it seems to me, is that under the Constitution the mere absence of a prohibition against an asserted power, plus the abstract reasonableness of its use, is enough to establish the existence of the power. I think this is erroneous. The powers of Congress, unlike those of the English Parliament, are constitutionally circumscribed. Under the Constitution Congress has only such powers as are expressly granted or those that are implied as reasonably necessary and proper to carry out the granted powers. Hence the constitutionality of the statute here in question must be tested, not by abstract notions of what is reasonable "in the large," so to speak, but by whether the statute, as applied in these instances, is a reasonably necessary and proper means of implementing a power granted to Congress by the Constitution. To say that the validity of the statute may be rested upon the inherent "sovereign powers" of this country in its dealings with foreign nations seems to me to be no more than begging the question. As I now see it, the validity of this court-martial jurisdiction must depend upon whether the statute, as applied to these women, can be justified as an exercise of the power, granted to Congress by Art. I, § 8, cl. 14 of the Constitution, "To make Rules for the Government and Regulation of the land and naval Forces." I can find no other constitutional power to which this statute can properly be related. I therefore think that we were wrong last Term in considering that we need not decide

the case in terms of the Article I power. In my opinion that question squarely confronts us.

(2) I also think that we were mistaken in interpreting *Ross* and the *Insular Cases* as standing for the sweeping proposition that the safeguards of Article III and the Fifth and Sixth Amendments automatically have no application to the trial of American citizens outside the United States, no matter what the circumstances. Aside from the questionable wisdom of mortgaging the future by such a broad pronouncement, I am satisfied that our prior holding swept too lightly over the historical context in which this Court upheld the jurisdiction of the old consular and territorial courts in those cases. I shall not repeat what my brother FRANKFURTER has written on this subject, with which I agree. But I do not go as far as my brother BLACK seems to go on this score. His opinion, if I understand it correctly, in effect discards *Ross* and the *Insular Cases* as historical anomalies. I believe that those cases, properly understood, still have vitality, and that, for reasons suggested later, which differ from those given in our prior opinions, they have an important bearing on the question now before us.

## II.

I come then to the question whether this court-martial jurisdiction can be justified as an exercise of Congress' Article I power to regulate the armed forces.

At the outset, I cannot accept the implication of my brother BLACK's opinion that this Article I power was intended to be unmodified by the Necessary and Proper Clause of the Constitution,[4] and that therefore this power

---

[4] Article I, § 8, cl. 18 of the Constitution provides that Congress shall have the power "to make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof."

is incapable of expansion under changing circumstances. The historical evidence, in fact, shows quite the opposite. True, the records of the time indicate that the Founders shared a deep fear of an unchecked military branch. But what they feared was a military branch unchecked by the *legislature,* and susceptible of use by an arbitrary *executive* power.[5] So far as I know, there is no evidence at all that the Founders intended to limit the power of the *people,* as embodied in the legislature, to make such laws in the regulation of the land and naval forces as are necessary to the proper functioning of those forces. In other words, there is no indication that any special limitation on the power of Congress, as opposed to the power of the executive, was subsumed in the grant of power to govern the land and naval forces. Alexander Hamilton, indeed, stated exactly the opposite: [6]

> "The authorities essential to the common defense are these: to raise armies; to build and equip fleets; to prescribe rules for the government of both; to direct their operations; to provide for their support. These powers ought to exist without limitation, *because it is impossible to foresee or define the extent and variety of national exigencies, or the correspondent extent and variety of the means which may be necessary to satisfy them.* The circumstances that endanger the safety of nations are infinite, and for this reason no constitutional shackles can wisely be

---

[5] Thus, proposals to limit the size of the standing army in times of peace to a specific number of men in the Constitution were defeated at the Constitutional Convention. See 5 Elliot's Debates 442–443 ("no room for . . . distrust of the representatives of the people"). See also The Federalist, No. 24: "[T]he whole power of raising armies was lodged in the *Legislature,* not in the *Executive;* . . . this legislature was to be a popular body, consisting of the representatives of the people periodically elected . . . ."

[6] The Federalist, No. 23.

imposed on the power to which the care of it is committed. This power ought to be coextensive with all the possible combinations of such circumstances; and ought to be under the direction of the same councils which are appointed to preside over the common defense.

.    .    .    .    .

". . . Shall the Union be constituted the guardian of the common safety? Are fleets and armies and revenues necessary to this purpose? The government of the Union must be empowered to pass all laws, and to make all regulations which have relation to them. . . .

.    .    .    .    .

"Every view we may take of the subject, as candid inquirers after truth, will serve to convince us, that it is both unwise and dangerous to deny the federal government an unconfined authority, as to all those objects which are intrusted to its management. . . . A government, the constitution of which renders it unfit to be trusted with all the powers which a free people *ought to delegate to any government,* would be an unsafe and improper depositary of the *national interests.* Wherever *these* can with propriety be confided, the coincident powers may safely accompany them."

No less an authority than Chief Justice Marshall, in *McCulloch* v. *Maryland,* 4 Wheat. 316, has taught us that the Necessary and Proper Clause is to be read with *all* the powers of Congress, so that "where the law is not prohibited, and is really calculated to effect any of the objects entrusted to the government, to undertake here to inquire into the degree of its necessity, would be to pass the line which circumscribes the judicial department, and to tread on legislative ground." *Id.,* at 423.

70

I think it no answer to say, as my brother BLACK does, that "having run up against the steadfast bulwark of the Bill of Rights, the Necessary and Proper Clause cannot extend the scope of [Art. I] Clause 14." For that simply begs the question as to whether there is such a collision, an issue to which I address myself below.

For analytical purposes, I think it useful to break down the issue before us into two questions: First, is there a rational connection between the trial of these army wives by court-martial and the power of Congress to make rules for the governance of the land and naval forces; in other words, is there any initial power here at all? Second, if there is such a rational connection, to what extent does this statute, though reasonably calculated to subserve an enumerated power, collide with other express limitations on congressional power; in other words, can this statute, however appropriate to the Article I power looked at in isolation, survive against the requirements of Article III and the Fifth and Sixth Amendments? I recognize that these two questions are ultimately one and the same, since the scope of the Article I power is not separable from the limitations imposed by Article III and the Fifth and Sixth Amendments. Nevertheless I think it will make for clarity of analysis to consider them separately.

A.

I assume, for the moment, therefore, that we may disregard other limiting provisions of the Constitution, and examine the Article I power in isolation. So viewed, I do not think the courts-martial of these army wives can be said to be an arbitrary extension of congressional power.

It is suggested that historically the Article I power was intended to embody a rigid and unchangeable selflimitation, namely, that it could apply only to those

in the actual service of the armed forces.[7]  I cannot agree that this power has any such rigid content.  First of all, the historical evidence presented by the Government convinces me that, at the time of the adoption of the Constitution, military jurisdiction was not thought to be rigidly limited to uniformed personnel.  The fact is that it was traditional for "retainers to the camp" to be subjected to military discipline, that civilian dependents encamped with the armies were traditionally regarded as being in that class, and that the concept was not strictly limited to times of war.[8]  Indeed, the British, who are no less sensitive than we to maintaining the supremacy of civil justice, have recently enacted a law comparable to the statute involved here.[9]

Thinking, as I do, that Article I, still taking it in isolation, must be viewed as supplemented by the Necessary and Proper Clause, I cannot say that the court-martial jurisdiction here involved has no rational connection with the stated power.  The Government, it seems to me, has

---

[7] To be sure, the opinion does "recognize that there might be circumstances where a person could be 'in' the armed services for purposes of [Art. I, § 8] Clause 14 even though he had not formally been inducted into the military or did not wear a uniform."  It continues, however, to state categorically that "wives, children and other dependents of servicemen cannot be placed in that category . . . ."

[8] The essential element was thought to be, not so much that there be war, in the technical sense, but rather that the forces and their retainers be "in the field."  The latter concept, in turn, would seem to have extended to any area where the nature of the military position and the absence of civil authority made military control over the whole camp appropriate.  See, in general, Blumenthal, Women Camp Followers of the American Revolution.  The British history is the same.  See, in particular, Samuel, Historical Account of the British Army and of the Law Military, pp. 691–692.

[9] Army Act, 1955, 3 & 4 Eliz. II, c. 18, § 209; and see Fifth Schedule, id., at 219.

72

made a strong showing that the court-martial of civilian dependents abroad has a close connection to the proper and effective functioning of our overseas military contingents. There is no need to detail here the various aspects of this connection, which have been well dealt with in the dissenting opinion of my brother CLARK. Suffice it to say that to all intents and purposes these civilian dependents are part of the military community overseas,[10] are so regarded by the host country, and must be subjected to the same discipline if the military commander is to have the power to prevent activities which would jeopardize the security and effectiveness of his command.[11] The matter has been well summarized by General Palmer, Commander of the Eighth Army, stationed in Japan:

"Jurisdiction by courts-martial over all civilians accompanying the Army overseas is essential because of the manner in which U. S. Armed Forces personnel

---

[10] These dependents are taken abroad only because their presence is deemed necessary to the morale and proper functioning of our armies overseas. They are transported at government expense, carry passports identifying them as service dependents, are admitted to the host country without visas, use military payment certificates, and receive the benefit of army postal facilities and privileges. They enjoy the tax exemptions and customs benefits of the military. They are treated at service hospitals, their children go to schools maintained by the Government, and they share with the military the recreational facilities provided by the Government. They are housed and furnished heat, light, fuel, water, and telephone service by the military, as well as receiving transportation, food, and clothing from military sources.

[11] This necessity is particularly acute with regard to peculiarly "military" and "local" offenses which must be dealt with swiftly and effectively. Thus security regulations at these military installations must be enforced against civilian dependents as well as servicemen; the same is true of base traffic violations, black marketeering, and misuse of military customs and post-exchange privileges.

live in their overseas military communities. In this command, almost all personnel serving in or accompanying the U. S. Armed Forces live in or near separate, closely-knit U. S. military communities which are basically under the control, administration and supervision of the local U. S. Commander who is in turn responsive to the normal military chain of command. This responsibility which is vested in the military commander extends to the administration and supervision of the operation and use of all facilities and major activities of the community including the proper control of occupants and users which is inherent in such supervision overseas. In the absence of a supporting judicial system responsive to the same government as the military, such as is the case existing in the United States and overseas possessions, and as the law enforcement requirement stems primarily from the immediate unalterable responsibilities of the overseas commander and his subordinate commanders, it is essential that the commander be vested with the law enforcement authority commensurate with his responsibilities."

It seems to me clear on such a basis that these dependents, when sent overseas by the Government, become *pro tanto* a part of the military community. I cannot say, therefore, that it is irrational or arbitrary for Congress to subject them to military discipline. I do not deal now, of course, with the problem of alternatives to court-martial jurisdiction; all that needs to be established at this stage is that, viewing Art. I, § 8, cl. 14 in isolation, subjection of civilian dependents overseas to court-martial jurisdiction can in no wise be deemed unrelated to the power of Congress to make all necessary and proper laws to insure the effective governance of our overseas land and naval forces.

74

## B.

I turn now to the other side of the coin. For no matter how practical and how reasonable this jurisdiction might be, it still cannot be sustained if the Constitution guarantees to these army wives a trial in an Article III court, with indictment by grand jury and jury trial as provided by the Fifth and Sixth Amendments.

We return, therefore, to the *Ross* question: to what extent do these provisions of the Constitution apply outside the United States?

As I have already stated, I do not think that it can be said that these safeguards of the Constitution are never operative without the United States, regardless of the particular circumstances. On the other hand, I cannot agree with the suggestion that every provision of the Constitution must always be deemed automatically applicable to American citizens in every part of the world. For *Ross* and the *Insular Cases* do stand for an important proposition, one which seems to me a wise and necessary gloss on our Constitution. The proposition is, of course, not that the Constitution "does not apply" overseas, but that there are provisions in the Constitution which do not *necessarily* apply in all circumstances in every foreign place. In other words, it seems to me that the basic teaching of *Ross* and the *Insular Cases* is that there is no rigid and abstract rule that Congress, as a condition precedent to exercising power over Americans overseas, must exercise it subject to all the guarantees of the Constitution, no matter what the conditions and considerations are that would make adherence to a specific guarantee altogether impracticable and anomalous. To take but one example: *Balzac* v. *Porto Rico,* 258 U. S. 298, is not good authority for the proposition that jury trials need never be provided for American citizens tried by

the United States abroad; but the case *is* good authority for the proposition that there is no rigid rule that jury trial must *always* be provided in the trial of an American overseas, if the circumstances are such that trial by jury would be impractical and anomalous. In other words, what *Ross* and the *Insular Cases* hold is that the particular local setting, the practical necessities, and the possible alternatives are relevant to a question of judgment, namely, whether jury trial *should* be deemed a necessary condition of the exercise of Congress' power to provide for the trial of Americans overseas.

I think the above thought is crucial in approaching the cases before us. Decision is easy if one adopts the constricting view that these constitutional guarantees as a totality do or do not "apply" overseas. But, for me, the question is *which* guarantees of the Constitution *should* apply in view of the particular circumstances, the practical necessities, and the possible alternatives which Congress had before it. The question is one of judgment, not of compulsion. And so I agree with my brother FRANKFURTER that, in view of *Ross* and the *Insular Cases*, we have before us a question analogous, ultimately, to issues of due process; one can say, in fact, that the question of which specific safeguards of the Constitution are appropriately to be applied in a particular context overseas can be reduced to the issue of what process is "due" a defendant in the particular circumstances of a particular case.

On this basis, I cannot agree with the sweeping proposition that a full Article III trial, with indictment and trial by jury, is required in every case for the trial of a civilian dependent of a serviceman overseas. The Government, it seems to me, has made an impressive showing that at least for the run-of-the-mill offenses committed by dependents overseas, such a requirement would

76

be as impractical and as anomalous as it would have been to require jury trial for Balzac in Porto Rico.[12]  Again, I need not go into details, beyond stating that except for capital offenses, such as we have here, to which, in my opinion, special considerations apply, I am by no means ready to say that Congress' power to provide for trial by court-martial of civilian dependents overseas is limited by Article III and the Fifth and Sixth Amendments.

[12] The practical circumstances requiring some sort of disciplinary jurisdiction have already been adverted to, *supra*, pp. 71–73.  These circumstances take on weight when viewed in light of the alternatives available to Congress—certainly a crucial question in weighing the need for dispensing with particular constitutional guarantees abroad. What are these alternatives?  (1) One is to try all offenses committed by civilian dependents abroad in the United States.  But the practical problems in the way of such a choice are obvious and overwhelming.  To require the transportation home for trial of every petty black marketeer or violator of security regulations would be a ridiculous burden on the Government, quite aside from the problems of persuading foreign witnesses to make the trip and of preserving evidence.  It can further be deemed doubtful in the extreme whether foreign governments would permit crimes punishable under local law to be tried thousands of miles away in the United States. (2) Civilian trial overseas by the United States also presents considerable difficulties.  If juries are required, the problem of jury recruitment would be difficult.  Furthermore, it is indeed doubtful whether some foreign governments would accede to the creation of extraterritorial United States civil courts within their territories— courts which by implication would reflect on the fairness of their own tribunals and which would smack unpleasantly of consular courts set up under colonial "capitulations."  (3) The alternative of trial in foreign courts, in at least some instances, is no more palatable.  Quite aside from the fact that in some countries where we station troops the protections granted to criminal defendants compare unfavorably with our own minimum standards, the fact would remain that many of the crimes involved—particularly breaches of security—are not offenses under foreign law at all, and thus would go completely unpunished.  Add to this the undesirability of foreign police carrying out investigations in our military installations abroad, and it seems to me clear that this alternative does not commend itself.

Where, if at all, the dividing line should be drawn among cases not capital, need not now be decided. We are confronted here with capital offenses alone; and it seems to me particularly unwise now to decide more than we have to. Our far-flung foreign military establishments are a new phenomenon in our national life, and I think it would be unfortunate were we unnecessarily to foreclose, as my four brothers would do, our future consideration of the broad questions involved in maintaining the effectiveness of these national outposts, in the light of continuing experience with these problems.

So far as capital cases are concerned, I think they stand on quite a different footing than other offenses. In such cases the law is especially sensitive to demands for that procedural fairness which inheres in a civilian trial where the judge and trier of fact are not responsive to the command of the convening authority. I do not concede that whatever process is "due" an offender faced with a fine or a prison sentence necessarily satisfies the requirements of the Constitution in a capital case. The distinction is by no means novel, compare *Powell* v. *Alabama*, 287 U. S. 45, with *Betts* v. *Brady*, 316 U. S. 455; nor is it negligible, being literally that between life and death. And, under what I deem to be the correct view of *Ross* and the *Insular Cases*, it is precisely the kind of distinction which plays a large role in the process of weighing the competing considerations which lead to sound judgment upon the question whether certain safeguards of the Constitution should be given effect in the trial of an American citizen abroad. In fact, the Government itself has conceded that one grave offense, treason, presents a special case: "The gravity of this offense is such that we can well assume that, whatever difficulties may be involved in trial far from the scene of the offense . . . the trial should be in our courts." I see no reason for not applying the same principle to any case where a civilian

dependent stands trial on pain of life itself. The number of such cases would appear to be so negligible that the practical problems of affording the defendant a civilian trial would not present insuperable problems.

On this narrow ground I concur in the result in these cases.

MR. JUSTICE CLARK, with whom MR. JUSTICE BURTON joins, dissenting.

The Court today releases two women from prosecution though the evidence shows that they brutally killed their husbands, both American soldiers, while stationed with them in quarters furnished by our armed forces on its military installations in foreign lands. In turning these women free, it declares unconstitutional an important section of an Act of Congress governing our armed forces. Furthermore, four of my brothers would specifically overrule and two would impair the long-recognized vitality of an old and respected precedent in our law, the case of *In re Ross*, 140 U. S. 453 (1891), cited by this Court with approval in many opinions and as late as 1929 by a unanimous Court [1] in *Ex parte Bakelite Corp.*, 279 U. S. 438, 451. And, finally, the Court reverses, sets aside, and overrules two majority opinions and judgments of this Court in these same cases, reported in 351 U. S., at 470 and 487, and entered on June 11, 1956, less than 12 months ago. In substitute therefor it enters no opinion whatever for the Court. It is unable to muster a majority. Instead, there are handed down three opinions. But, worst of all, it gives no authoritative guidance as to what, if anything, the Executive or the Congress may do to remedy the distressing situation in which they now find themselves.

---

[1] The Court was composed of Chief Justice Taft and Associate Justices Holmes, Van Devanter, McReynolds, Brandeis, Sutherland, Butler, Sanford, and Stone. Mr. Justice Van Devanter wrote the opinion for the Court.

Mr. Justice Burton and I remain convinced that the former opinions of the Court are correct and that they set forth valid constitutional doctrine under the long-recognized cases of this Court. The opinions were neither written nor agreed to in haste and they reflect the consensus of the majority reached after thorough discussion at many conferences. In fact, the cases were here longer both before and after argument than many of the cases we decide. We adhere to the views there expressed since we are convinced that through them we were neither "mortgaging the future," as is claimed, nor foreclosing the present, as does the judgment today. We do not include a discussion of the theory upon which those former judgments were entered because we are satisfied with its handling in the earlier opinions. See 351 U. S., at 470 and 487.

## I.

Before discussing the power of the Congress under Art. I, § 8, cl. 14, of the Constitution it is well to take our bearings. These cases do not involve the jurisdiction of a military court-martial sitting within the territorial limits of the United States. Nor are they concerned with the power of the Government to make treaties or the legal relationship between treaties and the Constitution. Nor are they concerned with the power of Congress to provide for the trial of Americans sojourning, touring, or temporarily residing in foreign nations. Essentially, we are to determine only whether the civilian dependents of American servicemen may constitutionally be tried by an American military court-martial in a foreign country for an offense committed in that country. Congress has provided in Article 2 (11) of the Uniform Code of Military Justice, 64 Stat. 109, 50 U. S. C. § 552 (11), that they shall be so tried in those countries with which we have an implementing treaty. The question therefore is whether

this enactment is reasonably related to the power of Congress "To make Rules for the Government and Regulation of the land and naval Forces." U. S. Const., Art. I, § 8, cl. 14.

Historically, the military has always exercised jurisdiction by court-martial over civilians accompanying armies in time of war. Over 40 years ago this jurisdiction was declared by Congress to include "all persons accompanying or serving with the armies of the United States without the territorial jurisdiction of the United States." [2] Art. of War 2 (d), 39 Stat. 651. Article 2 (11) of the present Uniform Code of Military Justice was taken without material change from this provision of the Articles of War. At the time of enactment of the earlier provision Congress was plainly concerned with the maintenance of discipline and morale of American expeditionary forces composed of both military and civilian personnel. As pointed out in the Senate Report to the Sixty-fourth Congress at the time Article 2 (d) was adopted:

> "The existing articles are further defective in that they do not permit the disciplining of these three classes of camp followers in time of peace in places to which the civil jurisdiction of the United States does not extend and where it is contrary to international policy to subject such persons to the local jurisdiction, or where, for other reasons, the law of the local jurisdiction is not applicable, thus leaving these classes practically without liability to punishment for their unlawful acts under such circumstances—as, for example, . . . where such forces so

[2] An interesting and authoritative treatment of court-martial jurisdiction over camp followers is found in Blumenthal, Women Camp Followers of the American Revolution (1952). It points out many instances where women, not in the armed services, were subjected to a court-martial long after the war had ended. This was not taken to be an "astronomical doctrine" either in our forces or abroad.

accompanied are engaged in the nonhostile occupation of foreign territory, as was the case during the intervention of 1906–7 in Cuba." S. Rep. No. 130, 64th Cong., 1st Sess. 37–38.

Since that time the power of Congress to make civilians amenable to military jurisdiction under such circumstances has been considered and sustained by this Court and other federal courts in a number of cases. In *Madsen* v. *Kinsella*, 343 U. S. 341 (1952), we sustained the jurisdiction of a military commission to try a civilian wife for the murder of her husband in Germany in 1949. Unlike Mrs. Smith, the petitioner in *Madsen* contended that a military court-martial had *exclusive* jurisdiction to try her pursuant to Article of War 2 (d), the predecessor of Article 2 (11). In upholding the constitutionality of trial by a military commission, we pointed out that its jurisdiction was concurrent with that of the military court-martial, 343 U. S., at 345, and that the jurisdiction of both stemmed directly from Article 2 (d), 343 U. S., at 361.

It is contended that no holding on the validity of court-martial jurisdiction over civilians was necessary to our decision in *Madsen* and that the case itself is distinguishable because occupied territory was involved and hence the action of Congress could be supported under the War Power. It is true that our reference to concurrent court-martial jurisdiction—when both petitioner and the Government agreed to it—was a concomitant to that decision, but our recognition of the power of Congress to authorize military trial of civilians under the circumstances provided for in Article 2 (d) was essential to the judgment. 343 U. S., at 361. *Madsen* was factually very similar to the present case, and in terms of the relevant considerations involved it is practically indistinguishable. In *Madsen,* as here, the crime involved was murder of a serviceman by a dependent wife living as a civilian with

our armed forces in a foreign country. In both cases jurisdiction was exercised by a military tribunal pursuant to an Act of Congress authorizing such jurisdiction over all persons accompanying the armed forces outside the territorial jurisdiction of the United States. The distinction that in one case the trial was by court-martial and in the other by a military commission is insubstantial. The contention that jurisdiction could be sustained in *Madsen* under the War Power of Congress but that this power is unavailable to authorize jurisdiction in *Smith* is likewise without merit.[3]   Aside from the fact that this Court has never restricted so narrowly the action that Congress might take under the War Power, see *Ashwander* v. *T. V. A.,* 297 U. S. 288 (1936), and *Silesian-American Corp.* v. *Clark,* 332 U. S. 469 (1947), there is as much, if not more, justification for employment of the War Power in Japan in 1952 as in Germany in 1949. At the time Mrs. Smith's crime was committed, Japan was the logistics and aviation base for actual hostilities then being waged in Korea, just across the Sea of Japan. And in 1949, Germany, after four years of peaceful and uneventful occupation, could hardly be considered an area where Congress could act only under its War Power. But the salient feature common to both countries was that the problems of maintaining control, morale, and discipline of our military contingents located there were substantially identical. These problems were not appreciably affected by the fact that one instance occurred during an occupation and the other shortly after a peace treaty had been signed.

Earlier, in *Duncan* v. *Kahanamoku,* 327 U. S. 304, 313 (1946), this Court had recognized the "well-established

---

[3] In this connection see "Madsen v. Kinsella—Landmark and Guidepost in Law of Military Occupation," by John M. Raymond, Assistant Legal Adviser, Department of State, 47 Am. J. Int'l L. 300 (1953).

power of the military" to exercise jurisdiction over persons directly connected with the armed forces, and this power has been repeatedly recognized in cases decided in the lower federal courts. See *United States ex rel. Mobley* v. *Handy*, 176 F. 2d 491 (1949); *Perlstein* v. *United States*, 151 F. 2d 167 (1945); *Grewe* v. *France*, 75 F. Supp. 433 (1948); *In re Berue*, 54 F. Supp. 252 (1944); *Hines* v. *Mikell*, 259 F. 28 (1919); *Ex parte Jochen*, 257 F. 200 (1919); *Ex parte Falls*, 251 F. 415 (1918); *Ex parte Gerlach*, 247 F. 616 (1917). See also *United States* v. *Burney*, 6 U. S. C. M. A. 776, 21 C. M. R. 98 (1956).

In considering whether Article 2 (11) is reasonably necessary to the power of Congress to provide for the government of the land and naval forces we note, as relevant, certain other considerations. As a nation we have found it necessary to the preservation of our security in the present day to maintain American forces in 63 foreign countries throughout the world. In recent years the services have recognized that the presence of wives and families at many of these foreign bases is essential to the maintenance of the morale of our forces. This policy has received legislative approval and the tremendous expense to the Government involved in the transportation and accommodation of dependents overseas is considered money well spent. It is not for us to question this joint executive and legislative determination. The result, however, has been the creation of American communities of mixed civilian and military population on military bases throughout the world. These civilians are dependent on the military for food, housing, medical facilities, transportation, and protection. Often they live in daily association in closely knit groups nearly isolated from their surroundings. It cannot be denied that disciplinary problems have been multiplied and complicated by this influx of civilians onto military bases, and Congress has provided that military personnel and civilians

alike shall be governed by the same law administered by the same courts.

Concerning the effect of civilian activities under such circumstances on the discipline and morale of the armed services, we have found no better statement than that of Judge Latimer of the United States Court of Military Appeals where the constitutionality of Article 2 (11) was upheld in the recent case of *United States* v. *Burney*, 6 U. S. C. M. A. 776, 21 C. M. R. 98 (1956). Referring to the combat readiness of an overseas command, Judge Latimer stated:

"[I]t is readily ascertainable that black market transactions, trafficking in habit-forming drugs, unlawful currency circulation, promotion of illicit sex relations, and a myriad of other crimes which may be perpetrated by persons closely connected with one of the services, could have a direct and forceful impact on the efficiency and discipline of the command. One need only view the volume of business transacted by military courts involving, for instance, the sale and use of narcotics in the Far East, to be shocked into a realization of the truth of the previous statement. If the Services have no power within their own system to punish that type of offender, then indeed overseas crime between civilians and military personnel will flourish and that amongst civilians will thrive unabated and untouched. A few civilians plying an unlawful trade in military communities can, without fail, impair the discipline and combat readiness of a unit. At best, the detection and prosecution of crime is a difficult and time-consuming business, and we have grave doubts that, in faraway lands, the foreign governments will help the cause of a military commander by investigating the seller or user of habit-forming drugs, or assist him in de-

terring American civilians from stealing from their
compatriots, or their Government, or from misusing
its property." 6 U. S. C. M. A., at 800, 21 C. M. R.,
at 122.

In addition, it is reasonable to provide that the military
commander who bears full responsibility for the care and
safety of those civilians attached to his command should
also have authority to regulate their conduct. Moreover,
all members of an overseas contingent should receive equal
treatment before the law. In their actual day-to-day liv-
ing they are a part of the same unique communities, and
the same legal considerations should apply to all. There
is no reason for according to one class a different treat-
ment than is accorded to another. The effect of such a
double standard on discipline, efficiency, and morale can
easily be seen.

In *United States ex rel. Toth* v. *Quarles,* 350 U. S. 11
(1955), the Court recognized this necessity. There Art. I,
§ 8, cl. 14, was "given its natural meaning" and "would
seem to restrict court-martial jurisdiction to persons who
are actually members *or part* of the armed forces." (Em-
phasis added.) *Id.,* at 15. The Court went on to say:

"It is impossible to think that the discipline of the
Army is going to be disrupted, its morale impaired,
or its orderly processes disturbed, by giving ex-serv-
icemen the benefit of a civilian court trial when they
are actually civilians. . . . Court-martial jurisdic-
tion sprang from the belief that within the military
ranks there is need for a prompt, ready-at-hand means
of compelling obedience and order. But Army dis-
cipline will not be improved by court-martialing
rather than trying by jury some civilian ex-soldier
who has been wholly separated from the service for
months, years or perhaps decades. Consequently
considerations of discipline provide no excuse for new

expansion of court-martial jurisdiction at the expense of the normal and constitutionally preferable system of trial by jury." *Id.*, at 22–23.

These women were as much "a part" of the military installation as were their husbands. Upon attack by an enemy they would be so treated; all foreign governments so recognized them at all times; and, in addition, it has been clearly shown, unlike in *Toth,* that "the discipline of the Army is going to be disrupted, its morale impaired, or its orderly processes disturbed" by excluding them from the provisions of the Uniform Code. Every single one of our major military commanders over the world has filed a statement to this effect in this case. We should not substitute our views as to this necessity for the views of those charged with the responsibility of the protection of such far-flung outposts of the free world. The former minority, however, repudiates this underlying basis of the opinion in *Toth,* namely, that where disciplinary measures are necessary to the regulation of the armed forces the Congress does have constitutional power to make rules. In my opinion the rules it has made are necessary to the regulation of the land and naval forces and the means chosen, the Uniform Code, is in no way an unreasonable one.

There remains the further consideration of whether this provision is " '*the least possible power adequate to the end proposed.*' " *United States ex rel. Toth* v. *Quarles, supra,* at 23. This is the strict standard by which we determine the scope of constitutional power of Congress to authorize trial by court-martial. A study of the problem clearly indicates that the use of the Uniform Code of Military Justice was really the only practicable alternative available.

While it was conceded before this Court that Congress could have established a system of territorial or consular

courts to try offenses committed by civilian .dependents abroad, the action of four of my brothers who would over-rule and two who would impair the vitality of *In re Ross, supra,* places this alternative in jeopardy. Territorial courts have been used by our Government for over a century and have always received the sanction of this Court until today. However, in the light of all of the opinions of the former minority here, the use of a system of territorial or consular courts is now out of the question. Moreover, Congress probably had concluded to abandon this system before the Uniform Code was adopted, since a short time thereafter the jurisdiction of the last of our territorial or consular courts was terminated. 70 Stat. 773.

Another alternative the Congress might have adopted was the establishment of federal courts pursuant to Article III of the Constitution. These constitutional courts would have to sit in each of the 63 foreign countries where American troops are stationed at the present time. Aside from the fact that the Constitution has never been interpreted to compel such an undertaking, it would seem obvious that it would be manifestly impossible. The problem of the use of juries in common-law countries alone suffices to illustrate this. Obviously the jury could not be limited to those who live within the military installation. To permit this would be a sham. A jury made up of military personnel would be tantamount to the personnel of a court-martial to which the former minority objects. A jury composed of civilians residing on the military installation is subject to the same criticism. If the jury is selected from among the local populace, how would the foreign citizens be forced to attend the trial? And perchance if they did attend, language barriers in non-English-speaking countries would be nigh insurmountable. Personally, I would much prefer, as did Mrs. Madsen, that my case be tried before a

military court-martial of my own countrymen. Moreover, we must remember that the agreement of the foreign country must be obtained before any American court could sit in its territory. In noncommon-law countries, if such courts were permitted to sit—a doubtful possibility—our jury system would be tossed about like a cork on unsettled waters.

Likewise, trial of offenders by an Article III court in this country, perhaps workable in some cases, is equally impracticable as a general solution to the problem. The hundreds of petty cases involving black-market operations, narcotics, immorality, and the like, could hardly be brought here for prosecution even if the Congress and the foreign nation involved authorized such a procedure. Aside from the tremendous waste of the time of military personnel and the resultant disruptions, as well as the large expenditure of money necessary to bring witnesses and evidence to the United States, the deterrent effect of the prosecution would be *nil* because of the delay and distance at which it would be held. Furthermore, compulsory process is an essential to any system of justice. The attendance of foreign nationals as witnesses at a judicial proceeding in this country could rest only on a voluntary basis and depositions could not be required. As a matter of international law such attendance could never be compelled and the court in such a proceeding would be powerless to control this vital element in its procedure. In short, this solution could only result in the practical abdication of American judicial authority over most of the offenses committed by American civilians in foreign countries.

The only alternative remaining—probably the alternative that the Congress will now be forced to choose—is that Americans committing offenses on foreign soil be tried by the courts of the country in which the offense is committed. Foreign courts have exclusive jurisdiction

under the principles of international law and many nations enjoy concurrent jurisdiction with the American military authorities pursuant to Article VII of the Agreement Regarding Status of Forces of Parties to the North Atlantic Treaty.[4] Where the American military authorities do have jurisdiction, it is only by mutual agreement with the foreign sovereign concerned and pursuant to carefully drawn agreements conditioned on trial by the American military authorities. Typical of these agreements was the one concluded between the United States and Japan on February 28, 1952, and in force at the time one of these cases arose. Under this and like agreements, the jurisdiction so ceded to the United States military courts will surely be withdrawn if the services are impotent to exercise it. It is clear that trial before an American court-martial in which the fundamentals of due process are observed is preferable to leaving American servicemen and their dependents to the widely varying standards of justice in foreign courts throughout the world. Under these circumstances it is untenable to say that Congress could have exercised a lesser power adequate to the end proposed.

## II.

My brothers who are concurring in the result seem to find some comfort in that for the present they void an Act of Congress only as to capital cases. I find no distinction in the Constitution between capital and other cases. In fact, at argument all parties admitted there could be no valid difference. My brothers are careful not to say that they would uphold the Act as to offenses less than capital. They unfortunately leave that decision for

---

[4] NATO Status of Forces Agreement, T. I. A. S. 2846 (signed in London on July 19, 1951), 4 U. S. Treaties and Other International Agreements 1792.

another day. This is disastrous to proper judicial administration as well as to law enforcement. The Congress and the Executive Department are entitled to know whether a court-martial may be constitutionally utilized to try an offense less than capital. If so, then all that is necessary is to eliminate capital punishment insofar as Article 2 (11) offenses are concerned. I deeply regret that the former minority does not, now that it has become the majority, perform the high duty that circumstance requires. Both the Congress and the Executive are left only to conjecture as to whether they should "sack" Article 2 (11) and require all dependents to return and remain within this country or simply eliminate capital punishment from all offenses under the Article. The morale of our troops may prevent the former and certainly the abstention of this Court prohibits the latter. All that remains is for the dependents of our soldiers to be prosecuted in foreign courts, an unhappy prospect not only for them but for all of us.